Steven LEVINE, Plaintiff,

v.

The SUPREME COURT OF WISCONSIN and Chief Justice Nathan S. Heffernan, Justice Shirley S. Abrahamson, Justice William A. Bablitch, Justice William G. Callow, Justice Louis J. Ceci, Justice Roland B. Day, Justice Donald W. Steinmetz, in their official capacities as Justices of the Supreme Court of Wisconsin and Stephen L. Smay, Executive Director of the State Bar of Wisconsin; and the State Bar of Wisconsin, an association of lawyers, Defendants.

No. 86-C-578-C.

United States District Court,
W.D. Wisconsin.

Feb. 19, 1988.

Steven Levine, Middleton, Wis., for plaintiff.

Edward S. Marion, Asst. Atty. Gen., Donald J. Hanaway, Atty. Gen., State of Wis., Madison, Wis., for defendant Justices.

John S. Skilton, Foley & Lardner, Madison, Wis., for defendants Smay and State Bar of Wis.

CRABB, Chief Judge.

This is a civil action for declaratory and injunctive relief, compensatory damages, and attorney's fees and costs. Jurisdiction is alleged under 42 U.S.C. § 1983. Plaintiff contends that his First Amendment rights of freedom of speech and of association are violated by Wisconsin's requirement that all practicing attorneys belong to the state bar association. Alternately, he contends that if mandatory bar membership does not violate the Constitution, the

use of his membership dues to fund political and ideological activities is unconstitutional.

Defendants argue that plaintiff's suit is barred by the principles of res judicata, Eleventh Amendment immunity, and by the Tax Injunction Act, and that even if it is not barred, the Supreme Court has held that mandatory bar associations are constitutional. They contend also that procedures instituted by the Wisconsin supreme court ensure the protection of dissident members' constitutional rights.

I conclude that plaintiff's suit is not barred. I conclude also that the requirement that plaintiff belong to the State Bar of Wisconsin as a condition of practicing law in Wisconsin abridges his rights of free speech and free association under the First Amendment to the United States Constitution and is not justified by a compelling state interest.

The case is before the court on the parties' cross motions for summary judgment. Based on the parties' proposed findings of fact, affidavits, and admissions on file, I find there is no genuine dispute as to the following material facts.

## FACTS

Plaintiff is a lawyer licensed to practice law in Wisconsin.

The State Bar of Wisconsin is an association of all lawyers licensed to practice law in Wisconsin.

In 1956, the Supreme Court for the State of Wisconsin ordered that all lawyers become members of the State Bar of Wisconsin on a two-year trial basis. In 1958 the order was made permanent.

Since 1956 the state supreme court has reviewed the status of the State Bar of Wisconsin several times. On each occasion, the court has decided to uphold the requirement of mandatory membership in the State Bar of Wisconsin for all lawyers licensed to practice in the state.

The structure and organization of the State Bar is governed by supreme court rules, and its operations are governed by the State Bar By–Laws.

The affairs of the State Bar are managed and directed by the board of governors, which is structured in such a way as to obtain representation of members from all geographic areas of the state.

The State Bar conducts annual and midwinter conventions, at which an Assembly of Members is held. The agenda includes major policy issues such as those relating to the administration of justice, the legal profession, the structure, organization and funding of the State Bar, legislative issues, and the annual budget. The assembly may consider and take binding action upon any matter on the agenda of the assembly other than the budget.

The activities of the State Bar are conducted by and through its board of governors, the assembly, and fifteen sections that focus on specific areas of the law, conduct research, and publish quarterly news letters on law practice and changes in the law. Bar activities are also conducted by and through thirteen standing committees and approximately twenty-five special committees serving a variety of purposes and by and through the three membership divisions.

The cost of conducting operations of a bar association of approximately 15,000 members is substantial. Annual expenses approach $2 million, not including continuing legal education activities, which are separately funded.

Annual dues for membership in the State Bar for the fiscal years beginning July 1, 1983, 1984, and 1985 were $100 annually for a lawyer in active practice more than three years. Dues were raised to $115 annually for the fiscal year beginning July 1, 1986.

Payment of annual membership dues to the State Bar is a condition of a lawyer's right to practice law. Under the by-laws of the State Bar, the Executive Director of the Bar must certify to the supreme court and to all courts in Wisconsin the names of all lawyers who have not paid State Bar membership dues.

Under supreme court rules, the dues of members who object to the State Bar's

legislative activities must be reduced on a pro rata basis in the amount of all State Bar expenses for legislative advocacy. Approximately 30 per cent of State Bar members opted to reduce their dues in the 1986–87 fiscal year. Accordingly, the Bar's budget for legislative advocacy was reduced from $27,119.00 to approximately $18,844.70. In an added effort to protect the rights of Bar members, the State Bar enacted a by-law providing for an arbitration proceeding in the event of a dispute over the calculation of the dues reduction.

The supreme court of Wisconsin exercises ultimate, direct, and exclusive control over the integrated State Bar. The supreme court has exercised its authority of review and regulation of the State Bar and its activities on numerous occasions.

Effective January 1, 1977, the supreme court created a nine-member Board of Attorneys Professional Competence. The board is funded by an assessment of all lawyers separate from State Bar dues. For the fiscal year beginning July 1, 1986, the board assessment for a full-time lawyer in practice more than three years was $9.00. The board administers the system for admission to practice law in Wisconsin and the rules governing continuing legal education, which are established by the supreme court. The State Bar does not administer the supreme court rules that govern the system for admission to practice law in Wisconsin or the rules governing continuing legal education. Effective January 1, 1977, the supreme court adopted a requirement of fifteen hours of continuing legal education per year for each lawyer admitted to practice in Wisconsin. Supreme court rules govern continuing legal education for Wisconsin lawyers.

The State Bar offers continuing legal education to Wisconsin lawyers through its ATS–CLE division's programs and publications. By order of the supreme court, no State Bar dues may be used to subsidize the State Bar ATS–CLE programs and publications. No dues are so used.

Effective January 1, 1977, the supreme court created a nine-member Board of Attorneys Professional Responsibility. The board is funded by an assessment of all lawyers separate from State Bar dues. For the fiscal year beginning July 1, 1986, the board assessment for a full-time lawyer in practice for more than three years was $49.70. The board administers the supreme court rules that govern the system for disciplining lawyers in Wisconsin. The State Bar is responsible for dividing the state into districts for professional responsibility committees, and for appointing members of those committees. In 1985, the supreme court denied State Bar petitions to make the Bar an official decision-maker on questions of lawyer ethics and the unauthorized practice of law.

Supreme court rules establish a Client Security Fund to reimburse losses caused to the public by dishonest lawyers. The fund is capitalized by an annual assessment of lawyers necessary to maintain a balance of $100,000. The assessment per lawyer may not exceed $11 in any year. The Client Security Fund is administered by the State Bar, but the assessment for the fund is in addition to State Bar annual membership dues, and it is kept separate from them.

The State Bar keeps a list of all lawyers licensed to practice law in Wisconsin. The list is a computerized mailing list that the bar uses for mailings to its membership and that it sells from time to time to various purchasers.

Supreme court rules require Wisconsin lawyers in private practice to keep trust accounts in which they place clients' funds. Certain information regarding these trust accounts must be reported on the lawyer's annual State Bar dues statement. The State Bar performs no function with respect to these lawyer trust account reports except to provide them to the Board of Attorneys Professional Responsibility on request when the board is investigating complaints against lawyers.

Revenues from State Bar dues are deposited to accounts held in the name of the State Bar.

Funds collected by the State Bar from its members to cover the budgets of the Boards of Attorneys Professional Compe-

tence and Professional Responsibility are turned over to an officer of the Wisconsin supreme court. The officer delivers the funds to the general accounts of the State of Wisconsin.

State Bar employees and officials are paid and reimbursed by checks drawn on State Bar accounts.

State Bar employees do not participate in the pension and health benefit plans offered by the State of Wisconsin to its employees and to employees of the Boards of Attorneys Professional Competence and Professional Responsibility.

The State Bar sets wage rates and classifications for its employees.

In 1981–82, the State Bar remodeled the State Bar center without approval from the state building commission.

The State Bar's annual budget is set by the board of governors and does not need approval by the governor, legislature, or Wisconsin supreme court.

From time to time since July 1, 1983, the State Bar has engaged in the presentation of viewpoints on matters before the following forums: the Wisconsin State Legislature, the Governor of the State of Wisconsin, the Congress of the United States, the general public, the supreme court of Wisconsin, both in legislative matters before the court and as amicus curiae in judicial proceedings. The State Bar has also appeared as friend of the court before the Wisconsin court of appeals and circuit courts in Wisconsin.

Some of the programs sponsored by the State Bar and funded from annual membership dues are designed to inform the public about legal questions, the functions of the courts, and the administration of justice.

In a memorandum of April 9, 1986, defendant Smay informed the Board of Governors that State Bar expenses for legislative advocacy in the fiscal years beginning July 1, 1983, 1984, and 1985 were $16,539, $25,514, and $23,442, respectively—a total of $65,495.

For its fiscal years beginning July 1, 1983, 1984, and 1985, the State Bar spent the following amounts on meetings of the board of governors: $33,617.20, $40,187.05, and $41,150.28, for a total of $114,875.

At meetings held between August 17, 1984 and April 18, 1986, the board of governors discussed the following matters, among others: a report by State Bar president Greg Conway concerning his appointment of a State Bar Economic Development Committee to aid economic development in Wisconsin, and the activities planned by that committee; the State Bar's response to an invitation by a Legislative Council study committee to testify concerning revision of Wisconsin's system for redressing medical malpractice injuries; hearings before the supreme court concerning State Bar participation in deciding questions of lawyer discipline and the unauthorized practice of law, and a supreme court proposal to institute a rebate of a portion of membership dues spent on legislative activities with which Bar members disagree; a proposal to give a $1,950 local bar grant to the Jefferson County Bar to conduct an experiment to determine the accuracy of breathalyzer machines (the proposal was voted upon and defeated); State Bar positions concerning regulation of the legal profession, legal education, the selection system for Wisconsin judges, federal administrative law judges and state agency hearing examiners, compensation of Wisconsin judges, the insanity defense in Wisconsin, product liability law, limits on compensation in wrongful death actions, no-fault auto insurance, the state inheritance tax, sales tax on professional services, diversity jurisdiction, the Legal Services Corporation; the contribution of $24,000 of State Bar money to a self-help group for alcoholic lawyers; the Boards of Attorneys Professional Competence and Professional Responsibility; publication of opinions of the court of appeals; the practice of law in Wisconsin by non-residents; prerequisites for admission to the Bar; the Interest on Lawyers Trust Accounts system; the nomination of lawyers to the board of directors of the Wisconsin Bar Foundation; actions taken by the American Bar Association; a state assembly bill that would increase the staff of the state public defender; the con-

tribution of $1,000 to lobby against a proposed change in the state's unemployment compensation law; a state assembly bill that would restructure the state's prosecutorial system (a motion directing a Bar committee to continue its study of this bill was passed); the allocation of an additional $15,000 of State Bar monies for "Public Understanding of the Law" television spots (the allocation was voted upon and passed, thereby increasing the yearly total to $20,-000); the use of approximately $4,000 for an actuarial study concerning legislative revision of the state's medical malpractice insurance system (the expenditure was voted upon and approved); the allocation of $1,000 in start-up costs to establish a State Bar International Transaction Section (the allocation was approved); a proposal to be introduced in the Wisconsin legislature concerning child support; the appointment of a committee to study crime victim compensation (the appointment was voted upon and approved); support of the passage by the Wisconsin legislature of the budget of the state public defender (the board of governors voted to support the passage); legal malpractice insurance; the filing of a friend of court brief in Dane County circuit court in *Frisch, Dudek & Slattery, Ltd. v. Wisconsin Department of Revenue* (the board voted to file the brief); a resolution concerning the effective date of a marital property trailer bill; a recommendation for a candidate to fill a vacancy on the Board of Attorneys Professional Responsibility; a resolution supporting the candidacy of Robert Habush for President–Elect of the American Trial Lawyers Association; full-time law clerks for circuit court judges; a State Bar survey of law firm operating costs; a request from the Wisconsin Broadcasters Association to support legislation to limit electronic media liability for defamation if a retraction is broadcast; a private malpractice insurance system; a resolution concerning the qualifications for court commissioner; a request from the dean of the University of Wisconsin Law School to lobby legislators against a provision in the state budget bill requiring a state audit of private funds donated to the University of Wisconsin; a report of the

Commission on Court Delay and Litigation Costs; the State Bar budget; the State Bar's role in lawyer ethics and the prevention of the unauthorized practice of law; a revision of the Code of Professional Responsibility; the work of a State Bar committee to study revision of the Wisconsin corporation law; campaign addresses from three candidates for election as state bar delegates to the American Bar Association House of Delegates; a resolution opposing apartheid in South Africa (the resolution was voted upon and passed); a state senate bill concerning the state prosecutorial system; the funding of the committee to study Wisconsin's business corporation law (the funding was voted upon and approved); a state senate bill concerning reform of Wisconsin's homicide law; the expenditure of $4,000 for a survey by a committee studying the participation of women in the State Bar (the expenditure was approved); a state senate bill concerning reform in the area of medical malpractice liability and other issues related to tort reform; the establishment of a branch of the United States District Court for the Eastern District of Wisconsin in Green Bay (the board of governors moved to support the establishment of a new branch).

On two occasions during the past ten years, the supreme court has appointed a committee to review the question of the continued integration of the State Bar, as well as to review its activities and funding.

The decision reported in *Matter of Discontinuation of Wisconsin State Bar*, 93 Wis.2d 385, 286 N.W.2d 601 (1980), concerned a petition by a group of Wisconsin lawyers requesting the Wisconsin supreme court to make membership in the Bar voluntary. The petition was filed following a vote of members of the Bar in which approximately 60% of those voting favored a voluntary rather than a unified Bar. In response to the petition, the supreme court noticed and held a public hearing, in which all members of the Bar were invited to participate and for which all members were invited to file comments. The hearing was not a factfinding hearing at which participants called witnesses, presented evidence,

cross-examined witnesses, or were represented by counsel. There were no formal parties to the proceeding, and no factual record was made. Plaintiff was one of a number of Bar members who participated in the proceeding by making an oral and written presentation to the court. The supreme court denied the petition to make membership in the Bar voluntary.

The proceeding that resulted in the publication of *Report of Committee to Review the State Bar*, 112 Wis.2d xix, 334 N.W.2d 544 (1983) was occasioned by the Wisconsin supreme court's appointment of a committee (known as the Kelly Committee) to review the performance of the Bar. Continued integration of the Bar was one of a number of subjects considered by the Kelly Committee. A public hearing on the committee's report was held on February 15, 1983. Notice of the hearing inviting participation by any member of the Bar or the public was published in the Wisconsin Bar Bulletin and the official state newspaper. The hearing held on the committee's report was not a factfinding hearing. No witnesses were called, no evidence was presented, and no witnesses were cross-examined. There were no formal parties, no factual record was made, and no one was represented by counsel. Plaintiff submitted a brief to the supreme court in response to the Kelly Committee report. He was one of a number of Bar members who participated in the proceeding by making oral and written presentations to the court. After the hearing the supreme court decided to maintain the Bar as a unified bar but decided that the use of Bar dues for legislative advocacy purposes was inappropriate.

### ADDITIONAL FACTS

Under Supreme Court Rule 10.10, the Wisconsin supreme court shall appoint a committee to review the State Bar's performance in carrying out its public functions at such time as the court deems advisable.

Under Supreme Court Rule 10.02(1), the State Bar may sue and be sued, enter into contracts, acquire, hold, encumber and dispose of real and personal property.

### OPINION

Before addressing the merits of plaintiff's suit, it is necessary to discuss defendants' contention that the suit is barred by the principles of res judicata, Eleventh Amendment immunity, and by the Tax Injunction Act.

## I. DEFENDANTS' PROCEDURAL ARGUMENTS

### 1. Res Judicata

Defendants base their res judicata argument on the fact that plaintiff has participated in two proceedings before the Wisconsin supreme court, each of which addressed the issue of the continuing integration of the State Bar of Wisconsin. *See In Matter of Discontinuation of State Bar of Wisconsin as an Integrated Bar*, 93 Wis.2d 385, 286 N.W.2d 601; *Report of Committee to Review the State Bar*, 112 Wis.2d xix, 334 N.W.2d 544. Plaintiff contends that these proceedings were not judicial proceedings, and that the doctrine of res judicata is therefore inapplicable.

According to 28 U.S.C. § 1738, the authenticated "[a]cts, records and judicial proceedings" of state courts "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." Thus, § 1738 requires a federal court to give to a state court judgment "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *see also Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 292 (1982); *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1154 (7th Cir.1984). Under Wisconsin law, a final judgment on the merits by a court of competent jurisdiction is conclusive as to all matters that were actually litigated or that might have been litigated

in all subsequent actions between the same parties. *DePratt v. West Bend Mutual Insurance Co.,* 113 Wis.2d 306, 311, 334 N.W.2d 883 (1983). Section 1738 applies to actions brought under 42 U.S.C. § 1983. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Therefore, if the proceedings before the Wisconsin supreme court were judicial proceedings, and if plaintiff raised or could have raised constitutional claims concerning the mandatory bar in those proceedings, he is barred by the doctrine of res judicata from bringing his § 1983 claims before this court.

■ It is important to determine whether plaintiff's claims were raised in a prior state judicial proceeding not only for purposes of res judicata but also to establish whether the court has jurisdiction over plaintiff's claims. Federal courts do not have jurisdiction over appeals from final state court decisions. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).[1]

Although the determination whether plaintiff's claims are barred by the doctrine of res judicata is a matter of state law, the initial determination whether plaintiff's claims were raised in a prior state *judicial* proceeding is a matter of federal law. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476 n. 13, 103 S.Ct. 1303, 1311 n. 13, 75 L.Ed.2d 206 (1983) (citing *In re Summers,* 325 U.S. 561, 565, 65 S.Ct. 1307, 1310, 89 L.Ed. 1795 (1945)). The Supreme Court's discussion of judicial proceedings in *Feldman* occurs in the context of its determination that the United States District Court for the District of Columbia did not have jurisdiction over the plaintiffs' claim that their constitutional rights were violated when the District of Columbia Court of Appeals refused to waive its bar admission requirements. Therefore, I must determine as an initial matter whether the two proceedings before the Wisconsin supreme court in which plaintiff participated were "judicial" proceedings.

The fact that the proceedings in which plaintiff participated were held before the supreme court is not determinative. The nature of a proceeding "depends not upon the character of the body but upon the character of the proceedings." *District of Columbia Court of Appeals v. Feldman,* at 477, 103 S.Ct. at 1312 (quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)). Feldman and another lawyer, Hickey, petitioned the defendant District of Columbia Court of Appeals for a waiver of its bar admission requirements. The court determined as a legal matter that Feldman was not entitled to a waiver of the rules. It adjudicated the plaintiff's claim of a present right to admission to the bar. The Supreme Court found that the adjudication of a present right was "the essence" of a judicial proceeding. *Id.* at 481, 103 S.Ct. at 1314. However, the Court found that the United States District Court did have jurisdiction over the plaintiffs' claims to the extent that they involved a general attack on the constitutionality of the bar admission requirements. *Id.* at 487, 103 S.Ct. at 1317. In other words, the federal court lacked subject matter jurisdiction only over those claims that were essentially appeals from a final judicial decision *in a particular case. Id.* at 486, 103 S.Ct. at 1316. Thus, a central characteristic of a judicial proceeding is its particularity: a judicial proceeding determines the present rights of a particular party in a particular fact situation. *See Randolph v. Lipscher,* 641 F.Supp. 767, 772 (D.N.J.1986) ("The discussion [in the prior court proceeding] is framed by reference to Randolph's particular situation"); *Lowrie v. Goldenhersh,* 716 F.2d 401, 406–407 (7th Cir.1983).

---

**1.** Defendants concede that their res judicata argument implies a jurisdictional one. In *Randolph v. Lipscher,* 641 F.Supp. 767, 780 (D.N.J. 1986), the court described the analysis in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) as a "two-step" analysis: "Following this analysis the courts first determine whether the complaint before them seeks direct review of a state 'judicial' action; to the extent that it does, it is dismissed for lack of subject matter jurisdiction. Second, they determine whether the remaining claims are barred under the claim and issue preclusion law of the forum state [ …]."

The proceeding in *In Matter of Discontinuation of State Bar of Wisconsin as an Integrated Bar*, 93 Wis.2d 385, 286 N.W.2d 601, was the result of a petition filed by five Wisconsin lawyers, not including plaintiff, asking the supreme court to discontinue the State Bar as a unified bar. The petition was noticed for a public hearing, and all interested persons were invited to submit written comments. *Id.* at 386, 286 N.W.2d 601. Plaintiff was one of eight individuals who gave "oral presentations" in favor of the discontinuation of the unified bar. *Id.* at 385, 286 N.W.2d 601. These presentations were in addition to the oral arguments. In its reported decision, the supreme court declined to discontinue the unified bar but stated that it would appoint a committee to review the State Bar's performance. *Id.* at 388, 286 N.W.2d 601.

Unlike the proceedings before the District of Columbia court of appeals in *Feldman*, the proceeding in *Discontinuation of State Bar* was not concerned with the adjudication of the present rights of one or more parties. It more closely resembled an administrative proceeding. Of course, whether the proceeding is best characterized as administrative, legislative, or ministerial is not relevant to the question whether the proceeding was judicial or not.

The court's decision to maintain the bar as a mandatory bar applied not only to plaintiff but to all those who might wish to practice law in Wisconsin in the future. Although *Discontinuation of State Bar* was a response to a petition, the petitioners did not claim that their rights had been violated or that they were entitled to special relief. Rather, they informed the court of a poll they had taken which, according to petitioners, indicated that the mandatory bar was not in the interest of the court, the state of Wisconsin, or the public at large. *In Matter of Discontinuation of Wisconsin State Bar*, 93 Wis.2d at 386, 286 N.W. 2d 601. *See also Rapp v. Committee on Professional Ethics and Conduct of Iowa State Bar Association*, 504 F.Supp. 1092 (S.D.Iowa 1980) (fact that plaintiffs had proposed amendments to state's professional code of ethics and participated in public hearing before state supreme court on subject of the amendments did not convert proceeding into judicial proceeding).

As its title suggests, the *Report of Committee to Review the State Bar*, 112 Wis. 2d xix, 334 N.W.2d 544, addressed the report of the committee (the Kelly Committee) appointed by the supreme court to study the performance of the State Bar. Prior to its discussion in *Report of Committee*, the court held a public hearing concerning the issues addressed by the Kelly Committee. *Id.* at xx, 334 N.W.2d 544. Plaintiff submitted a brief in response to the Kelly Committee's report. In *Report of Committee*, the court discussed various recommendations made by the Kelly Committee concerning State Bar activities. One of these recommendations concerned a rebate procedure for dues expended to support legislative activity to which Bar members objected. The court assumed *"arguendo"* that a recent line of cases in the Supreme Court and other federal courts might apply to financial support of legislative activity by the Bar but found that the rebate procedure proposed by the committee was an adequate means of protecting the rights of dissident members. *Id.* at xxiv, 334 N.W.2d 544.

Thus, in *Report of Committee*, the supreme court simply discussed the report of the Kelly Committee, accepting some of the committee's recommendations and rejecting others. The supreme court's review of the Kelly Committee report does not resemble the adversary proceeding in *Falk v. State Bar of Michigan*, 631 F.Supp. 1515 (W.D.Mich.1986), *aff'd*, 815 F.2d 77 (6th Cir.1987), cited by defendants. In *Falk*, the plaintiff initiated the challenge to state bar practices through a "Petition for Special Relief." *Id.* at 1517. The Michigan supreme court held a series of evidentiary hearings before dismissing the plaintiff's petition. *Id.* at 1517. In contrast to the court in *Falk*, the Wisconsin supreme court appointed the Kelly Committee on its own initiative, pursuant to supreme court rules. The *Report of Committee* is simply a response to the committee's recommendations, not an adjudication of plaintiff's

rights arising out of a particular set of facts.

I conclude that the proceedings before the Wisconsin supreme court were not judicial proceedings for purposes of 28 U.S.C. § 1738. Therefore, it is unnecessary to address defendants' argument that plaintiff is barred by the doctrine of res judicata from bringing claims under 42 U.S.C. § 1983 before this court.

*2. Eleventh Amendment Immunity*

This defense is raised only by defendant State Bar of Wisconsin, which argues that it is a state agency, protected from suit by the Eleventh Amendment. "[I]n the absence of consent a suit in which the state or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986) (quoting *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984)); *Morris v. Washington Metropolitan Area Transit Authority,* 781 F.2d 218, 222–23 (D.C.Cir.1986). Plaintiff has not shown that the State of Wisconsin has consented to this suit.

■ In determining whether a particular entity is a state agency for Eleventh Amendment purposes, courts must balance several factors. *See Morris v. Washington Metropolitan Area Transit Authority,* 781 F.2d at 223 (discussing *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Jensen v. State Board of Tax Commissioners of State of Indiana,* 763 F.2d 272, 277 (7th Cir.1985) (court must "evaluate generally" several factors in determining whether an agency is immune from suit under the Eleventh Amendment). One of the most important factors to consider in determining whether a particular entity is an "alter ego" of the

state, and hence immune from suit, is the effect on the state treasury of a judgment in the plaintiff's favor. *Miller–Davis Co. v. Illinois State Toll Highway Authority,* 567 F.2d 323, 327 (7th Cir.1977); *Ram Ditta v. Maryland National Capital Park and Planning Commission,* 822 F.2d 456, 457 (4th Cir.1987); *but cf. Jensen v. State Board of Tax Commissioners of State of Indiana,* 763 F.2d at 277 (effect on state treasury, standing alone, is not a dispositive factor).[2] Other factors include the entity's degree of autonomy from the state, its involvement with local, rather than state, concerns, the way it is treated by state law, *Ram Ditta v. Maryland National Capital Park and Planning Commission,* 822 F.2d at 457–58, and the interference with public administration that might result from a judgment against the entity, *Jensen v. State Board of Tax Commissioners of State of Indiana,* 763 F.2d at 277.

■ A judgment against the State Bar would not affect the state treasury. I have found that there is no genuine dispute with respect to the financial autonomy of the State Bar. The State Bar is empowered to sue and be sued. State Bar funds are deposited in accounts held in the name of the State Bar of Wisconsin, not in accounts of the State of Wisconsin. State Bar funds and the Bar's annual budget are under the control of the State Bar board of governors, a body elected by members of the Bar without the approval of state officials.

The State Bar's financial autonomy is an important sign of its overall independence. The facts that the State Bar sets its own wage rates and classifications, that State Bar employees do not participate in health and pension plans offered to state employees, and that the Bar may initiate building projects without approval of the Wisconsin building commission, rebut the contention

---

**2.** In *Jensen,* the court determined that the State Board of Tax Commissioners of the State of Indiana was a state agency; it then addressed the argument that the board was not immune from suit nevertheless because a judgment against it would not be paid out of the state treasury. *See Jensen v. State Board of Tax Commissioners of State of Indiana,* 763 F.2d at 276–

277. In addressing this argument, the court stated that the effect on the state treasury was not a dispositive factor in determining immunity. Thus, the court's statement regarding the state treasury factor was not made in the context of an initial determination whether an agency was an alter ego of the state.

that the State Bar is a state agency in the usual sense.

Defendants point out that the State Bar is subject to the supervision and control of the Wisconsin supreme court. *See State ex rel. Armstrong v. Board of Governors,* 86 Wis.2d 746, 749, 273 N.W.2d 356 (1979). Moreover, the supreme court has referred to the Bar on occasion as an "agency." *See Lathrop v. Donohue,* 10 Wis.2d 230, 242, 102 N.W.2d 404 (1960), *aff'd,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) ("the State Bar is a public and not a private agency").[3] However, in that case the state supreme court was not concerned with the principles of federalism embodied in the Eleventh Amendment and it was not characterizing the State Bar as a public agency in the context of a determination of immunity from suit under that Amendment.

In determining immunity from suit, the effect of a judgment on the state treasury and the interference with public administration seem the most critical factors. I have determined that a judgment against defendant would not affect the state treasury. Although the State Bar is under the supervision of the Wisconsin supreme court, it is largely a self-governing entity. Its day-to-day decisions are not subject to approval by the supreme court, the legislature, or a state agency. A judgment against defendant State Bar would not interfere significantly with state administrative functions. Therefore, I conclude that defendant State Bar is not a public agency for purposes of the Eleventh Amendment, and hence is not immune from suit.

### 3. Tax Injunction Act

Defendants contend that plaintiff's claims are barred under the Tax Injunction Act, 28 U.S.C. § 1341, which states that district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the court of such State." According to defendants' argument, the collection of State Bar membership dues under the rule establishing the mandatory bar is a collection of a tax, and therefore this court lacks jurisdiction to hear plaintiff's requests for an injunction against collection of dues and for an order requiring refund of past dues.

A determination of a "tax" under the Tax Injunction Act is a matter of federal law. Courts must look to the congressional policies underlying the Act rather than to the labels attached to what is alleged to be a tax. *Timber Ridge Associates v. City of Hartford,* 578 F.Supp. 221, 223 (E.D.Wis.1984) (citing *Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371, 374 (3d Cir.1978)); *Schneider v. Colegio de Abogados de Puerto Rico,* 546 F.Supp. 1251 at 1275.[4] According to the court in *Robinson Protective Alarm Co.,* two purposes underlying the Act were the desire "to deprive out-of-state corporations of an advantage over state taxpayers in being able to threaten localities with protracted litigation in federal courts," and the desire "to avoid federal judicial interference with state revenue raising operations and administration of their tax code."

---

**3.** Courts in other jurisdictions have held that unified state bars are state agencies and therefore immune from suit. *See, e.g., Krempp v. Dobbs,* 775 F.2d 1319, 1321 n. 1 (5th Cir.1985) (Texas Bar); *Ginter v. State Bar of Nevada,* 625 F.2d 829 (9th Cir.1980). However, the Texas State Bar is declared an agency of the Texas Judicial Department by state statute. *Krempp v. Dobbs,* 775 F.2d at 1321 n. 1. In *Ginter,* the court held that the State Bar of Nevada was a state agency without explaining its holding.

Professor Theodore Schneyer argues that there are several, often inconsistent images of the unified state bar: the bar is at one and the same time an autonomous association, a public agency, and a "closed shop." Schneyer, The Incoher-

ence of the Unified Bar Concept, 1983 A.B.F. Research Journal 1, 79 (1983).

To declare the State Bar a state agency once and for all would ignore the unique characteristics of unified bar associations. My determination that the State Bar is not a state agency is made only for the purpose of deciding the parties' motions and in the context of defendants' Eleventh Amendment argument.

**4.** Defendants cite state cases in support of the contention that a tax is money expended for public purpose or a monetary exaction that exceeds the cost of regulation. These citations are not relevant. Federal courts have held that state law is not determinative in defining "tax" for the purposes of § 1341.

*Schneider v. Colegio* at 1275 (quoting *Robinson Protective Alarm Co.* at 375–376).[5]

■ State Bar membership dues are not a part of Wisconsin's state revenue raising operations. They are deposited to an account belonging to the State Bar, not to the State of Wisconsin. The dues are expended for State Bar operations, and are under the control of the board of governors, a body elected by the membership. Neither an injunction against the collection of State Bar dues nor an order requiring the refund of past dues would violate the Tax Injunction Act.

Having addressed defendants' procedural arguments and determined that plaintiff's suit is not barred, I turn next to the merits of plaintiff's constitutional arguments.

## II. CONSTITUTIONALITY OF MANDATORY BAR MEMBERSHIP

### 1. The Nature of Plaintiff's First Amendment Claims

Plaintiff contends that mandatory bar membership violates his rights of freedom of association and speech, or alternatively, that the use of his dues to support political and ideological activities, or any activities unrelated to the purposes for which the unified Bar was created, violates those rights. Plaintiff's primary challenge is to the constitutionality of conditioning the practice of law upon membership in the State Bar of Wisconsin. I begin by looking to the nature of the rights asserted by plaintiff.

■ The right to associate with others in pursuit of political, social, economic, educational, religious, and cultural ends is protected by the First Amendment. *Roberts v. United States Jaycees*, 468 U.S. 609, 622,

104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 (1984). *See also N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 907–909, 932–933, 102 S.Ct. 3409, 3422–3423, 3435–3436, 73 L.Ed.2d 1215 (1982); *Abood v. Detroit Board of Education*, 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977).

The analysis of plaintiff's First Amendment claims is complicated by the fact that plaintiff asserts a *negative* right: the right not to associate with the State Bar of Wisconsin, and the right not to give financial support to speech with which he disagrees. The analysis would be relatively straightforward if this case were one in which plaintiff claimed the right to associate with other lawyers for the purpose of engaging in activities such as informational programs directed toward the lay public, the study of proposed legislation, or efforts to assist lawyers suffering from alcoholism. Clearly, such ends of association would be protected by the First Amendment.

But this is not a case in which lawyers desire to associate for expressive ends and need the protection of the First Amendment to do so. In this case, their association is protected by the state. In fact, the state does more than protect the Bar: the state *requires* lawyers to join the Bar in its pursuit of expressive ends. Thus, where once lawyers associated voluntarily with one another, they are now members of a state-mandated association. This transformation of the right to associate from an act of individual choice into an act of the state is what plaintiff challenges. He asserts his "right of self-determination in matters that touch individual opinion and personal attitude." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, at 631,

---

5. This recitation of the congressional purposes underlying the enactment of the Tax Injunction Act is not an overly restrictive interpretation of the Act, as defendants contend. Defendants argue that the Supreme Court has broadly interpreted those purposes in *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981). However, the Court's interpretation of the purposes of the Tax Injunction Act in *Rosewell* does not differ from the interpretation offered by the court in *Robinson Protective Alarm Co.*. In *Rosewell*, the Court stated that the Tax Injunction Act "has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations." *Id.* at 522, 101 S.Ct. at 1234 (quoting *Tully v. Griffin, Inc.*, 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed. 2d 227 (1976)). The opinion in *Robinson* also addresses the issue of federalism and the undesirability of interfering with a State's fiscal operations.

63 S.Ct. 1178, at 1181–1182, 87 L.Ed. 1628 (1943).

The matters touching plaintiff's "individual opinion and personal attitude" are not limited to specific activities of the Bar such as lobbying. Plaintiff's right to self-determination extends to the matter of compulsory membership in a professional organization. To join or not to join such an organization is itself an expression of one's "individual opinion and personal attitude." *See Abood v. Detroit Board of Education*, 431 U.S. 209, 257, 97 S.Ct. 1782, 1810, 52 L.Ed.2d 261 (1977) (Powell, J., concurring) (noting that teachers challenging agency shop arrangements might have ideological opposition not just to the union's political and ideological activities, but to the very idea of public-sector unionism).

The First Amendment protects negative rights. Freedom of speech includes freedom not to speak, *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 106 S.Ct. 903, 912, 89 L.Ed.2d 1 (1986); *see also West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178 and the freedom to associate includes the right not to associate, *Roberts v. United States Jaycees*, 468 U.S. at 623, 104 S.Ct. at 3252 (citing *Abood v. Detroit Board of Education*, 431 U.S. at 234–235, 97 S.Ct. at 1799; *see also PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100, 100 S.Ct. 2035, 2050, 64 L.Ed.2d 741 (1980) (Powell, J., concurring in part and concurring in the judgment) (right not to be compelled to respond to views with which one disagrees by compelling association with those views).

These cases express the logical corollary of the First Amendment right *to do* something, whether the "something" be public speech or association for the pursuit of other protected ends. The essence of that right is individual choice, and of necessity, choice involves the decision not to do something as well as the decision to do something. Plaintiff argues that the First Amendment protects his choice not to join the Bar in the first instance, and also his choice not to join the Bar in collective "speech," or "expression." [6]

## 2. The Balancing Test

Even if the First Amendment protects plaintiff's choice not to join the Bar, however, there might be instances in which the State would be justified in denying him this choice. The right to associate and not to associate is not absolute. *Roberts v. United States Jaycees*, 468 U.S. at 623, 104 S.Ct. at 3252; *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956). Government may regulate even such ends of association as political speech and religious belief, *see, e.g., Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (holding constitutional municipal prohibition against the posting of political signs on light posts); *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (not unconstitutional to prohibit serviceman who was ordained rabbi and orthodox Jew from wearing yarmulke while on duty and in uniform), and because the government may infringe upon protected ends such as speech and religion, it may also infringe upon associations in pursuit of those ends.

In every First Amendment case, the question is what degree of infringement upon the right of association is permissible under the Constitution. Over the years, the Supreme Court has attempted to answer this question in a manner that would provide guidance to the lower courts and others facing the same question in different factual situations. In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, the Court emphasized the primacy of First Amendment rights and the resulting burden on government to justify any inhibition of those

---

**6.** Plaintiff relies on a broad definition of speech. I will address this definition in a later part of the opinion.

rights.[7] In *American Communications Association v. Douds,* 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), the Supreme Court described the court's task as a choice between two conflicting interests: the governmental interest in regulation and the individual right to freedom of speech and association. In *Douds* the Court seemed more willing to concede the potential legitimacy of governmental infringement upon First Amendment rights. Indeed, it emphasized the fact that courts must reweigh the two conflicting interests in each case; it did not assign from the outset great weight to the individual right at stake, as it had done in *Barnette.* Professor Nimmer describes this case-by-case method of weighing individual rights against governmental interests as "ad hoc balancing." M. Nimmer, Nimmer on Freedom of Speech § 2.02 (1984).

The Supreme Court still employs the "balancing test" enunciated in the *Douds* case. But in later cases its formulation of the test strikes a balance between the more absolutist vision of First Amendment rights in *Barnette* and the "ad hoc" position of *Douds.* According to the more recent test, "[i]nfringments on [the right to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. United States Jaycees,* 468 U.S. at 623, 104 S.Ct. at 3252. *See also Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976) (means serving important state interest must be "closely drawn"); *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) (state interest in regulation infringing upon First Amendment right "must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest"). The Court's recent attempts to stake out

the limits of governmental infringement provide more guidance than the case-by-case, "ad hoc" balancing described in *Douds.* Courts must still give substance to the general phrases of the balancing test, but that is the task of courts in any interpretation of parties' rights under the Constitution. *See* Nimmer on Freedom of Speech § 2.03 at 2–21.

### 3. Lathrop v. Donohue

Defendants have contended from the outset that plaintiff's First Amendment challenge to compulsory bar membership was put to rest in 1961 in *Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826. Plaintiff argues that the decision in *Lathrop* is not determinative, both because the Court did not apply the balancing test when it decided the case, and because the facts upon which the Court based its decision in *Lathrop* have changed. Because the issue is critical to the discussion of plaintiff's asserted right not to join the Bar, I turn next to a discussion of the case.

In *Lathrop v. Donohue,* a Wisconsin lawyer challenged the recently unified State Bar on constitutional grounds before the Wisconsin supreme court, which rejected the challenge. *Lathrop v. Donohue,* 10 Wis.2d 230, 102 N.W.2d 404 (1960). In a plurality opinion, the United States Supreme Court affirmed the Wisconsin supreme court's dismissal of the plaintiff's complaint, holding that the plaintiff could be compelled to give financial support to bar activities. The justices in the plurality declined to reach the question whether the plaintiff could be compelled constitutionally to support the Bar's legislative activities, *id.,* 367 U.S. at 845, 81 S.Ct. at 1839, although a majority of justices concluded that the plaintiff's freedom of speech claim was properly before the Court.

The Court found that Wisconsin had a legitimate interest in a unified bar. Using language reminiscent of the language of its

---

7. In *Barnette,* the Court held unconstitutional a resolution passed by a local school board requiring public school pupils to begin the school day with the pledge of allegiance and flag salute: "We think the action of the local authorities in compelling the flag salute and pledge

transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* 319 U.S. at 630, 63 S.Ct. at 1181.

commerce clause decisions, the Court formulated that interest as follows:

> Both in purport and in practice the bulk of State Bar activities serve the function, *or at least so Wisconsin might reasonably believe,* of elevating the *educational* and *ethical* standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy. We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity.

*Id.* at 843, 81 S.Ct. at 1838 (emphasis added).[8]

The Court viewed the issue of freedom of association in *Lathrop* as involving *"only* [ ...] a question of compelled financial support of group activities, not [ ...] involuntary membership in any other aspect." *Id.* at 828, 81 S.Ct. at 1830 (emphasis added). The Court concluded that "[g]iven the character of the integrated bar *shown on this record,* in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association." *Id.* at 843, 81 S.Ct. at 1838 (emphasis added). Two factors appear to have been important in the Court's decision regarding the plaintiff's freedom of association claim: the record before it, and the fact that the plaintiff's membership duties were limited to the compulsory payment of dues.[9]

The character of the Bar as presented to the Supreme Court in *Lathrop* was that of a quasi-public agency. *See* Schneyer, The Incoherence of the Unified Bar Concept at 54–55 ("Basically, Brennan saw the state bar as a public agency created to fund and administer regulatory or governmental programs"). In 1961, "[t]he most extensive activities of the State Bar" were "those directed toward post-graduate education of lawyers [ ...]." *Lathrop v. Donohue,* 367 U.S. at 839, 81 S.Ct. at 1836 (quoting *Lathrop v. Donohue,* 10 Wis.2d at 246, 102 N.W.2d at 412–413). The Bar participated also in the handling of grievances against lawyers, as well as in programs designed to prevent the unauthorized practice of law. *Id.* at 839, 840, 81 S.Ct. at 1836. Although the Court mentioned many other Bar activi-

**8.** In general, the language of the Court's commerce clause cases is typically very deferential to legislative judgment, sometimes even in the absence of extensive legislative findings. In recent years, the Court has been more willing to *presume* the legitimacy of the state's asserted interests. Typical of this language, which is echoed in *Lathrop,* is the following passage from *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955): "Likewise, when it is necessary to duplicate a lens, a written prescription may or may not be necessary. But the legislature *might have concluded* that one was needed often enough to require one in every case. Or the legislature *may have concluded* that eye examinations were so critical [that] every change in frames and every duplication of a lens should be accompanied by a prescription from a medical expert" (emphasis added). The language used by the Court in discussing Wisconsin's interest in the unified bar is not far removed from that in *Williamson,* a commerce clause case. In *Lathrop,* of course, the Court had a more substantial record than the record considered in *Wil-*

*liamson.* Thus, its construction of the governmental interest at stake was not quite so speculative. Nevertheless, the language in both cases reflects the Court's deference to the legislature.

**9.** Professor Theodore Schneyer has suggested a third factor. In Professor Schneyer's view, Justice Brennan's plurality opinion also upheld the constitutionality of the unified bar based on Justice Brennan's understanding of the Bar's policy for making decisions. Justice Brennan's understanding was based on a policy statement adopted shortly after the Bar came into existence that recommended that the rule of substantial unanimity be observed in state bar position taking. "[W]hatever the [substantial unanimity] rule's real effect in bar affairs, it allowed [Brennan] to treat state bar advocacy as the same, in principle, as advocacy by a private, voluntary association, in which a member's decision to belong would be taken to indicate her consent to the activity." Schneyer, The Incoherence of the Unified Bar Concept, 1983 Am.B.F.Res.J. 1, 55, 56 (1983) (citing *Lathrop v. Donohue,* 367 U.S. at 834, 81 S.Ct. at 1833).

ties, it saw the Bar's focus on "educational and ethical standards," *id.* at 843, 81 S.Ct. at 1838, as an interest legitimate enough to override the plaintiff's associational claim, and it saw the dues that the Bar exacted from its members as having more of the character of licensing fees or other taxes than of dues. *See id.* at 865, 81 S.Ct. at 1849 (Harlan, J., concurring). In stressing the legitimacy of the Bar's regulatory function in the area of education and professional ethics, the Court adhered to a line of cases upholding the authority of the state to regulate the Bar in the face of constitutional challenges. *See, e.g., In re Summers,* 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945); *In re Anastaplo,* 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961). *But see United Mine Workers of America, District 12 v. Illinois State Bar Association,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (later cases finding First Amendment limitations on state's authority to regulate practice of law); *see also Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (decided under the privileges and immunities clause, but using the "substantial state interest"/"least restrictive means" standard).

Since the Supreme Court's decision in *Lathrop,* however, the character of the State Bar of Wisconsin has changed from what was presented to the Court. In 1976, the Wisconsin supreme court created the Board of Attorneys Professional Responsibility and the Board of Attorneys Professional Competence to administer lawyer discipline and bar admission requirements, with their financial support derived from assessments on all Wisconsin lawyers separate from the mandatory membership dues. In 1977, the state supreme court required the Bar's ATS–CLE continuing legal education programs to be completely self-supporting. *See In re Regulation of the Bar,* 81 Wis.2d xxxv, xli, (1977). It is no longer the case that membership dues support the activities that gave the Bar its quasi-public character in *Lathrop.*

Defendants argue that membership dues are still spent on activities related to the important functions of continuing legal education, lawyer discipline, and professional competence. They note, for example, that the Bar spends time and money appointing members to various regional professional responsibility committees, which report instances of possible lawyer misconduct or medical incapacity to the administrator of the Board of Attorneys Professional Responsibility. They assert as well that Bar publications like the Wisconsin Bar Bulletin and the lawyer-to-lawyer referral service are also funded by membership dues and are in the interest of professional education and competence.

Although the activities cited by defendants are relevant to the goals of professional responsibility and competence, they are of a quite different nature from those presented to the Supreme Court twenty-seven years ago in *Lathrop.* It is not the Bar but arms of the Wisconsin supreme court that are primarily responsible for the "educational and ethical standards" of Wisconsin lawyers; and it is not Bar membership dues that support these arms. The Bar challenged by plaintiff is not the same bar examined in *Lathrop.* These changes in the responsibilities of the State Bar weaken *Lathrop's* authority. *See* 20 Am Jur.2d Courts § 191 (1965) (*stare decisis* does not apply where facts are essentially different).

The character of the State Bar is not the only thing to have changed since *Lathrop.* The Supreme Court's analysis of First Amendment cases has changed as well. Justice Black noted in *Lathrop* that the Court was employing the case-by-case (that is, "ad hoc") balancing test derived from *American Communications Association v. Douds. Lathrop v. Donohue,* 367 U.S. at 872, 81 S.Ct. at 1853 (Black, J., dissenting). Since *Lathrop,* however, the Court has tended to require that the state demonstrate a compelling interest in order to justify significant infringements on an individual's First Amendment rights. More-

over, the infringement must be the least restrictive means available to achieve the compelling state interest. Because the Court's analysis of freedom of association claims has evolved since *Lathrop* was decided, and also because the Bar has changed its character since then, I conclude that *Lathrop* is no longer dispositive of plaintiff's challenge.

### 4. The Seriousness of the Infringement on Plaintiff's First Amendment Rights

■ There may be no need to balance governmental interest against the right to freedom of association if the government's infringement on that right is minimal. *See Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) (balancing test involves "significant impairment" of First Amendment rights); *Regan v. Time, Inc.*, 468 U.S. 641, 696, 104 S.Ct. 3262, 3292, 82 L.Ed.2d 487 (1984) (Stevens, J., concurring in part and dissenting in part) (governmental interests may not need to be subjected to exacting scrutiny when balanced against "minimal" intrusions on expression).

Although the Bar has changed materially since *Lathrop* was decided, mandatory membership in the Bar still consists solely in the payment of dues, just as it did when *Lathrop* was decided. There is no requirement that members attend meetings or social activities, or that they espouse personally the positions taken by the Bar. The Supreme Court did not consider the mandatory payment of dues a very significant infringement on plaintiff Lathrop's First Amendment right not to associate. Justice Harlan, for example, saw a substantive difference between Lathrop's claim and the plaintiffs' First Amendment claims in *Barnette*.

> What seems to me obvious is the large difference in degree between, on the one hand, being compelled to raise one's hand and recite a belief as one's own, and, on the other, being compelled to contribute dues to a bar association fund which is to be used in part to promote the expression of views in the name of the organization (not in the name of the dues payor), which views when adopted may turn out

to be contrary to the views of the dues payor. I think this is a situation where the difference in degree is so great as to amount to a difference in substance.

*Lathrop v. Donohue*, 367 U.S. at 858, 81 S.Ct. at 1846 (Harlan, J., concurring in judgment).

It is necessary to determine whether the Court would take the same view as it did in *Lathrop* of the infringement on plaintiff's First Amendment rights. If it would still find the mandatory payment of dues an insignificant infringement, there is no need to require defendants to show a compelling state interest in order to justify the dues requirement.

#### a. Forced association with the ideas of others

Justice Harlan's "difference in degree" argument was based in part on his contention that Lathrop himself could not be identified personally with positions taken by the State Bar. *Lathrop v. Donohue*, 367 U.S. at 856, 81 S.Ct. at 1844 (Harlan, J., concurring). Unlike the plaintiffs in *Barnette*, Lathrop was not required to affirm publicly ideas or beliefs with which he disagreed; therefore, it was unlikely that the public would mistake State Bar positions for Lathrop's own. Justice Harlan was unwilling to extend First Amendment protection to such an indirect form of compelled association and speech.

■ However, in the years following the *Lathrop* decision, the Court has been receptive to less restrictive readings of the First Amendment than Justice Harlan's. *See, e.g., New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (libel protected under First Amendment in certain circumstances); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (Court could not find offensive expletive devoid of social value and hence unprotected under First Amendment); *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (corporate speech protected). It is not surprising, therefore, that the Court has used a somewhat different yardstick to measure the "difference in degree" be-

tween the compelled affirmation of belief in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, and other forms of compelled association. Plaintiffs are no longer required to show that they have been compelled to "speak" in the literal sense, or that they have been compelled to affirm personally some state-sponsored ideology, before the Court will consider their claims under the First Amendment.

For example, in *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Court found that the plaintiff, a Jehovah's Witness, could not be compelled to display New Hampshire's state motto "Live Free or Die" on his license plates. "Here, as in *Barnette,* we are faced with a state measure which forces an individual, as part of his daily life—indeed constantly while his automobile is in public view—to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715, 97 S.Ct. at 1435. The Court might have echoed Justice Harlan's concurrence in *Lathrop* by pointing out that Maynard could not be identified personally with the motto that, like all citizens of New Hampshire, he was required to display as a condition of driving an automobile. Yet the Court found that the difference between *Barnette* and the facts of *Wooley* was "essentially one of degree," *id.* at 715, 97 S.Ct. at 1435, and not "so great as to amount to a difference in substance."

In *Pacific Gas & Electric Co. v. Public Utilities Commission of California,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1, the Court held that a utility company could not be compelled to include in "extra space" in its billings the views of consumer groups opposed to its policies. The state decision requiring the utility to give the consumer group access in its billing envelopes not only compelled the utility to "associate with speech" with which it disagreed, *id.* 106 S.Ct. at 911; it forced the utility to respond to the group's views, *id.* at 909. The regulation at issue in *Pacific Gas &*

*Electric* may appear more intrusive than the license plate law in *Wooley,* and hence closer to the regulation in *Barnette.* On the other hand, the utility's customers were unlikely to mistake the views of the consumer group for the utility's own. Furthermore, the plaintiff asserting the First Amendment right not to associate in *Pacific Gas & Electric* was a business corporation, not an individual as in *Barnette* or other, "classic" First Amendment cases. Yet the Court did not find the degree of difference between such classic cases and the facts of *Pacific Gas & Electric* to be so great as to deny the corporate plaintiff protection under the First Amendment.[10]

There is little danger that people will identify plaintiff personally with the State Bar's positions, assuming they know that all lawyers in Wisconsin must belong to the State Bar. Yet *Wooley* and *Pacific Gas* indicate that the Court does not restrict the definition of compelled association to the identification of an individual with views he does not share. This restricted definition implies that an individual's associational right is infringed only when others might have the mistaken impression that he associates voluntarily when in fact he does not. But in *Wooley* and *Pacific Gas* the Court did not require the plaintiffs to allege the risk of mistaken impressions. Rather, the Court focused on the idea of compulsion itself. It held that the plaintiffs had the right to be free from forced participation in the dissemination of ideas, even where the chance of their personal identification with those ideas was remote.

In *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, the Court recognized yet another potential aspect of the burden of compelled association. *PruneYard* upheld a state court interpretation of the state constitution permitting groups to pass out political material on the premises of a privately owned shopping center. The Court noted that the owner of the shopping center had not objected to the *views* expressed by the group seeking to

---

10. Of course, the Court had opened the way for inclusion of corporations within the scope of the First Amendment in the commercial speech cases, beginning with *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

use the shopping center. In a concurring opinion, however, Justice Powell noted that [t]o require the owner to specify the particular ideas he finds objectionable enough to compel a response would force him to relinquish his "freedom to maintain his own beliefs without public disclosure." [...] Thus, the right to control one's own speech may be burdened impermissibly even when listeners will not assume that the messages expressed on private property are those of the owner. *Id.* at 100, 100 S.Ct. at 2050 (Powell, J., concurring in part and concurring in the judgment).[11] Writing for the majority in *Pacific Gas & Electric,* 106 S.Ct. 903, Justice Powell developed the idea that forced association may result in compelled speech: "[T]he State is not free either to restrict appellant's speech to certain topics or views *or to force appellant to respond to views that others may hold." Id.* at 909 (emphasis added). In the present case, plaintiff ran for a seat on the State Bar's board of governors primarily in order to oppose its policies. His compelled membership in the bar compelled him to dissociate himself from State Bar policies by speaking out against them on the board of governors. Defendants assert that one of the advantages of a unified bar is that it represents a diversity of viewpoints. Paradoxically, this diversity is obtained through a restriction on choice in matters touching individual opinions and ideas.

### b. Mandatory Payment of Dues

In *Lathrop* the Court found that there was no infringement of the plaintiff's right to associate because the payment of dues was the only manifestation of his compelled association. Justice Harlan compared the dues requirement to taxes and licensing fees. *Lathrop v. Donohue,* 367 U.S. at 857, 865, 81 S.Ct. at 1845, 1849 (Harlan, J., concurring). He saw no difference between Lathrop's situation and that of the federal taxpayer who objects to certain publications of the United States Information Agency. *Id.* at 857, 81 S.Ct. at 1845.

Recent Supreme Court cases have undercut the Court's conclusion in *Lathrop* that the payment of dues money was insignificant because it was the only way in which Lathrop was compelled to associate. The most important of these cases is *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), in which the Court held that financial contributions to political campaigns constituted "speech," and that mandated limitations on contributions were unconstitutional. Although the Court was concerned in *Buckley* with political speech, it found that "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Id.* at 19, 96 S.Ct. at 635. The implications of *Buckley* extend beyond definitions of political speech.[12]

In defining "speech" broadly in *Buckley,* the Court indicated that the distinction between freedom of association and freedom of speech is not always clear. The law limiting financial contributions in *Buckley* "impose[d] direct quantity restrictions on political *communication and association* by persons, groups, candidates, and political parties [...]" (emphasis added). *Id.* at 18, 96 S.Ct. at 634. When an individual makes a financial contribution to a political campaign, he or she associates

---

11. In *Lathrop,* the Court found Lathrop's complaint too vague to reach Lathrop's First Amendment claims because Lathrop did not specify what Bar activities he found objectionable. *See Lathrop v. Donohue,* 367 U.S. at 847, 81 S.Ct. at 1840. However, the Court recognized later that requiring plaintiffs to state precisely why they object to the use of membership dues to support certain activities would constitute compelled speech. *Abood v. Detroit Board of Education,* 431 U.S. at 241, 97 S.Ct. at 1802.

12. In any event, protection under the First Amendment is not restricted to political speech, although political speech has been placed traditionally on the "highest rung" of First Amendment values. *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1980) (quoting *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed. 2d 263 (1980)). The Court has "never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters—to take a nonexhaustive list of labels—is not entitled to full First Amendment protection." *Abood v. Detroit Board of Education,* 431 U.S. at 231, 97 S.Ct. at 1797.

with like-minded individuals, and at the same time expresses, or "speaks," certain opinions through that contribution.[13] Thus, *compelled* payment of contributions would infringe on both the right of association and the right of speech.

The potential seriousness of compelled contributions was recognized in *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) and became a central concern in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782. At issue in *Abood* was a Michigan law authorizing public employee unions and local government employers to require agency shops as a condition of employment. Under an agency shop clause, employees must pay union membership dues even if they do not formally join the union. In *Abood* the Court held that the Michigan law was constitutional, but that membership dues could not be used to finance political activities unrelated to collective bargaining. Agency shops were not themselves unconstitutional because the state had a strong interest in promoting industrial peace through the selection of a single, collective-bargaining agent. *Id.* at 220–221, 224–225, 97 S.Ct. at 1791–1792, 1793–1794.[14] Although the Court held that the compulsory payment of union dues was constitutional, it recognized that the payment constituted an infringement on the plaintiff's First Amendment rights.

> To be required to help finance the union as a collective-bargaining agent *might well be thought,* therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, *or to refrain from doing so, as he sees fit.* But the judgment in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contri-

bution of the union shop to the system of labor relations established by Congress. *Id.* at 222, 97 S.Ct. at 1793 (emphasis added). Although the Court adhered to *Hanson* and *Street,* cases also relied upon in *Lathrop,* it appears to have abandoned its position in *Lathrop* that the mere payment of dues is not a significant infringement on First Amendment rights. In a concurring opinion, Justice Powell stressed the significance of the infringement, finding no distinction between the payment of dues to a public sector union and the limitation on political contributions struck down in *Buckley:*

> Certainly, if individual teachers are ideologically opposed to public-sector unionism itself, as are the appellants in this case [ . . . ], one would think that compelling them *to affiliate* with the union by contributing to it infringes their First Amendment rights to the same degree as compelling them to contribute to a political party.

*Abood* at 257, 97 S.Ct. at 1811 (Powell, J., concurring) (citations omitted) (emphasis added).[15] And in a later union shop case, *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* 466 U.S. 435, 455, 104 S.Ct. 1883, 1896, 80 L.Ed.2d 428 (1984), the Court conceded that "[b]y allowing the union shop at all, we have already countenanced *a significant impingement* on First Amendment rights" (emphasis added). In short, the Court has realized that forced financial contributions constitute significant infringements on First Amendment rights. I can find no distinction between the mandatory payment of union dues as a condition of employment and the mandatory payment of State Bar membership dues as a condition of practicing law.

---

**13.** Justice Harlan had already questioned the distinction between freedom of speech and association under the circumstances present in *Lathrop,* where the condition of association was the payment of money, and where the same money was used to support various speech activities. *Lathrop v. Donohue,* 367 U.S. at 850, 81 S.Ct. at 1841 (Harlan, J., concurring in judgment).

**14.** *See* the discussion of the union shop cases in the next section of this opinion.

**15.** In Justice Powell's view, "[t]hat *Buckley* dealt with a contribution limitation rather than a contribution requirement" did not diminish its relevance to the contributions challenged in *Abood.* *Abood v. Detroit Board of Education,* 431 U.S. at 256, 97 S.Ct. at 1810 (Powell, J., concurring).

Cases like *Buckley* and *Abood* make Justice Harlan's comparison of bar membership dues with taxes less convincing because they focus on the voluntary nature of financial contributions to particular groups (in *Abood*, the involuntariness of the contributions provoked the Court's scrutiny under the First Amendment). Although taxpayers may object on occasion to the way their taxes are used, taxes support governmental services that benefit a majority of citizens. Bar membership dues do not benefit the public, except in a very indirect way. Rather, they support services that benefit members of a particular, and rather exclusive, group. Members of this group could choose not to benefit from the services financed by membership dues without becoming "free riders"—that is, without becoming like non-union employees who benefit from the union's collective bargaining or like citizens who would continue to benefit from government services like highways and police protection even if they refused to pay taxes.[16] In short, considerations of policy and administration that apply to taxes distinguish them from dues exacted by particular groups for the exclusive benefit of those groups. As a consequence, one cannot dismiss plaintiff's claim simply by saying that compulsory membership dues are no different from licensing fees or taxes.

Moreover, like the plaintiff in *Wooley*, plaintiff is faced with a serious penalty for failure to comply with the "mere" payment of money. In *Wooley*, the plaintiff was charged with a misdemeanor when he taped over the motto on his license plate. In this case, plaintiff is faced with the loss of his livelihood. Indeed, he is faced with the loss of a right to practice law. In *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 281, 105 S.Ct. 1272, 1277, the Court stated that the opportunity to practice law is a "fundamental right."

No one would dispute that reasonable conditions may be attached to a lawyer's right to practice law, and that ethical regulations and educational requirements are reasonable requirements to which lawyers should be subject. But these are no longer the primary responsibility of the Bar. Plaintiff is precluded from practicing law if he does not support television spots promoting public understanding of the law, the publication of a lawyer-to-lawyer directory, or a law office management consulting service, to name but a few of the Bar's activities. The penalty attached to the failure to pay membership dues underscores the significance of the infringement on plaintiff's right to associate and to speak.

█ In summary, the Court appears to have adopted a less literal approach to the First Amendment's guarantee of freedom of speech and association than it did in *Lathrop*. The Court measures the "degree of difference" between the compelled affirmation of belief in *Barnette* and more indirect forms of compelled association and speech against a more finely marked yardstick than Justice Harlan's. Some people, especially some lawyers, may still share Justice Harlan's skepticism about the constitutional significance of mandatory bar membership dues. Perhaps this is because lawyers and courts have been willing to watch over others' First Amendment rights but have seldom trained their eyes on the constitutional implications of their own activities. Union shops are a concern while unified bars are not. In other words, it may be difficult for lawyers and courts to dissociate their roles as adjudicators and "officers of the court" from their roles as private citizens who share the same rights under the Constitution as railway workers, school teachers, and utility companies. One might object that as officers of the court, lawyers are never mere private citizens and hence, that there is nothing illegitimate in requiring them to belong to a professional organization. Yet as Justice Black observed,

16. Those who chose not to join a voluntary bar association might nevertheless benefit from activities of the bar association that enhanced the public's image of lawyers or that protected the interests of lawyers. But such non-members would not be "free riders" as that term is used in the union shop cases. In the union context, "free riders" receive a direct economic benefit *as the result of the union's collective bargaining efforts.*

[t]he mere fact that a lawyer has important responsibilities in society does not require or even permit the State to deprive him of those protections of freedom set out in the Bill of Rights for the precise purpose of insuring the independence of the individual against the Government and those acting for the Government.

*Lathrop*, 367 U.S. at 876, 81 S.Ct. at 1855 (Black, J., dissenting). If the protections of the Bill of Rights have been extended to cover the payment of mandatory union dues, there is no reason why they should not be extended to cover the payment of bar dues, which is more than a minimal infringement on plaintiff's rights of free association and speech.

In the union shop cases, the infringements on employees' First Amendment rights not to associate and not to speak were upheld, not because the infringement itself was minimal, but because the governmental interest at stake was compelling. Therefore, I must now determine whether the governmental interest asserted by defendants to justify the mandatory bar is sufficiently compelling to outweigh the infringement on plaintiff's First Amendment rights of association and speech.

*5. The Union Shop Analogy and the Question of Compelling State Interest*

Courts have often compared the mandatory bar to the union shop. *See, e.g., Gibson v. The Florida Bar*, 798 F.2d 1564, 1567 (11th Cir.1986); *Arrow v. Dow*, 544 F.Supp. 458, 460 (D.N.M.1982). The comparison is useful for the determination whether the state's interest in a mandatory bar is compelling. In the union shop cases, the Court considered in some detail the governmental interest in union (or agency) shops. Thus, what was held by the Court to constitute a compelling state interest in the union shop cases can serve as a gauge in this case.

In *Railway Employes' Department v. Hanson*, 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956), Justice Douglas, writing for the majority, first suggested the analogy between union shops and mandatory bars. Justice Douglas later rejected

the analogy in his dissent in *Lathrop*. *See Lathrop v. Donohue*, 367 U.S. at 879, 81 S.Ct. at 1857 ("on reflection the analogy fails"). But other members of the Court found the analogy persuasive in regard to the freedom of association issue. *See Lathrop v. Donohue*, 367 U.S. at 849, 81 S.Ct. at 1841 (Harlan, J., concurring). And other federal courts have continued to view integrated bars as analogous to union shops in deciding the narrower question whether bar members may be compelled financially to support legislative activities. *See Gibson v. The Florida State Bar*, 798 F.2d 1564; *Arrow v. Dow*, 544 F.Supp. 458. Thus, in *Lathrop*, the Court compared the unified bar to the union shop; since it had found that persons could be compelled to pay membership dues to a union in *Hanson*, it reached the same conclusion in regard to unified bars in *Lathrop*.

In *Abood v. Detroit Board of Education*, 431 U.S. at 220–221, 97 S.Ct. at 1971–1792, the Court explained the considerations that had led it to reject First Amendment challenges to the compulsory payment of union dues as a condition of employment in *Hanson* and in *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784:

> The holding in *Hanson*, as elaborated in *Street*, reflects familiar doctrines in the federal labor laws. The principle of exclusive union representation, which underlies the National Labor Relations Act as well as the Railway Labor Act, is a central element in the congressional structuring of industrial relations. [...] It [...] frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations.

(Citations omitted). Finally, the designation of a single union as collective bargaining representative, and the requirement that all employees support the union financially, counteract the problem of "free riders": those employees who might "refuse to contribute to the union while obtaining benefits of union representation that neces-

sarily accrue to all employees." *Id.* 431 U.S. at 222, 97 S.Ct. at 1792–1793. As the detailed justification of the union shop in *Abood* indicates, the Court believes that Congress has an important governmental interest in maintaining industrial peace. *See also Ellis v. Railway Clerks,* 466 U.S. at 455–456, 104 S.Ct. at 1895–1896.

However, the Court expressed its concern with the degree of impingement on employees' First Amendment rights by restricting the activities that they may be compelled to support financially. *See Machinists v. Street* (union members could not be required to support political causes under the Railway Labor Act); *Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963) (suggesting refund of dues spent on political activities); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782 (public employees could not be required to support political or ideological causes to which they objected); *Ellis v. Railway Clerks* (rebate of dues spent on such causes constitutionally insufficient); *Chicago Teachers Union, Local No. 1, AFT, AFL–CIO v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) (discussing adequacy of procedures evolved to protect First Amendment rights of dissenting non-union members in agency shop).

Motivated by these cases, the Wisconsin supreme court has responded to challenges to compulsory bar membership by providing lawyers an opportunity to deduct from their dues payments an amount representing lobbying expenses. More recently, it has approved an arbitration procedure for cases in which dissenting members disagree with the Bar about the amount of dues they may deduct. *See In the Matter of the Petition to Review State Bar Bylaw Amendments,* 139 Wis.2d 686, 407 N.W.2d 923 (1987). Such measures do not make compulsory membership constitutional; they only reduce the infringement if a compelling state interest is present. They do not solve the problem of the person who opposes the very idea of a compulsory bar.

The similarities between the union shop and the unified bar are evident.[17] The union shop and the unified bar are associations of persons engaged in a particular kind of work. In both instances, the right of employment is conditioned upon the payment of membership dues to these associations. But the fact that unified bars look like union shops does not necessarily mean that there exists a governmental interest comparable to the interest in industrial peace that would justify the infringement on plaintiff's First Amendment rights.

It was the Supreme Court that first suggested the analogy between union shop and unified bar (although, as I have noted, Justice Douglas subsequently re-considered the appropriateness of the analogy), and the Court has alluded to the analogy since *Lathrop. See, e.g., Abood v. Detroit Board of Education,* 431 U.S. at 217 n. 10, 97 S.Ct. at 1790 n. 10. Thus, the Court has *implied* that unified bars are justified by a compelling governmental interest similar to Congress' interest in industrial peace. Yet *Lathrop* was the last case in which the Court discussed unified bars, and hence the last case in which it discussed at any length the governmental interest in the unified bar.[18] In *Lathrop,* the Court found the state's interest in professional education and ethics to be a "legitimate" governmental interest. I would concede that that interest is not merely legitimate but compelling. Nevertheless, as I have found, the

---

**17.** In a union shop, employees must formally belong to the union, although formal membership is limited essentially to the payment of dues. In an agency shop, employees need not be union members, but they are still required to support financially the union's collective bargaining efforts and activities related to collective bargaining. *See Ellis v. Railway Clerks,* 466 U.S. at 456, 104 S.Ct. at 1896. The unified bar is more similar to the union shop. However, I do not find that any potential difference between union and agency shops is relevant to the applicability of the union cases to the present case.

**18.** As discussed above, in *Lathrop* the Court did not examine in detail either the nature of the right asserted by the plaintiff or the significance of the claimed infringement on that right. Therefore, it did not balance the plaintiff's rights against the asserted governmental interest in the way that the Court has done in other cases cited in this opinion.

precedential value of *Lathrop* is weakened by the fact that the Bar no longer regulates directly the activities the Supreme Court found to be legitimate state interests. Therefore, it is questionable whether Wisconsin's interest in the Bar's current role in professional education and ethics is a compelling state interest.

The Bar's membership dues do not support directly continuing legal education, lawyer discipline, or matters relating to bar admissions standards. The Wisconsin supreme court has appointed special bodies to regulate these matters. Nor are other concededly important regulatory concerns funded by bar membership dues. By supreme court rule, special assessments apart from bar dues are levied against attorneys to maintain the Client Security Fund, a fund used to reimburse losses caused to the public by dishonest lawyers. The Wisconsin supreme court requires that lawyers keep trust accounts for clients' funds. Although the court requires lawyers to report information regarding these trust accounts on their annual State Bar dues statements, the Bar has no responsibility in connection with the trust accounts aside from the reporting function.

Defendants argue that many other activities engaged in by the Bar constitute important state interests. It notes communication with the public and studies of proposed legislation as two examples. These activities are not insignificant, but they are not the compelling governmental interest of regulation of lawyer competence and ethics.[19] The membership dues that plaintiff is challenging are not the payments he is required to make to support the Boards of Attorneys Professional Responsibility and Professional Competence, but those that support the variety of other activities sponsored by the Bar. In the context of the balancing test, and in light of the union shop cases, I cannot find that these activities or the whole host of other Bar activities constitute a compelling state interest.[20]

### 6. Least Restrictive Means

Even if the interests asserted by defendants were sufficiently compelling to justify an infringement on plaintiff's First Amendment rights, defendants have made no showing that compulsory membership in the Bar is the least restrictive means of achieving those interests. *See Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 106 S.Ct. at 913. Yet the balancing test requires the government to demonstrate that it has not swept overbroadly in its pursuit of a legitimate regulatory interest.

Defendants have submitted no facts tending to show that in the absence of mandatory membership, the Bar's goals could not be achieved.[21] As of 1983, nine-

---

**19.** Defendants can point to no other organization in which the state compels membership for the purpose of obtaining views on legislation. One might argue that lawyers have special competence in this area, but this argument has several weaknesses. Wisconsin's Legislative Council already performs drafting and research work. Wis.Stat. § 13.81. Furthermore, because the Bar's legislative activities are restricted to fields concerning the administration of justice, court reform, and legal practice, the scope of its advisory role is limited. Finally, the argument that the state has a compelling interest in obtaining lawyers' views on legislation is undercut by recent Bar bylaws allowing members to deduct from their dues payments pro rata amounts for the Bar's legislative activities. If the interest were compelling, there would be no reason to provide for dues reductions.

**20.** The union shop cases are not the only cases to give substance to the "compelling state interest" guideline. In *Roberts v. United States Jay-* cees, 468 U.S. 609, 104 S.Ct. 3244, the Court upheld a Minnesota law that made it illegal for organizations like the Jaycees to exclude women from regular membership. The Court determined that Minnesota had a compelling state interest in preventing discrimination on the basis of sex. I agree with plaintiff that the state interest asserted by defendants does not rise to the level of the interest asserted in *Roberts*, given the present functions of the Bar. *See also Board of Directors of Rotary International v. Rotary Club of Duarte*, — U.S. —, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (associational right of organization with stricter membership requirements than Jaycees does not override state's interest in preventing sex discrimination).

**21.** In an affidavit, Franklyn Gimbel, a past president of the State Bar, expresses the opinion that some lawyers would be able to evade their professional responsibilities if the Bar were voluntary. He is also of the opinion that a voluntary

**1502**

teen states had voluntary bar associations, including the neighboring states of Minnesota and Illinois. *See* Schneyer at 3. It is likely that these voluntary bar associations share many goals with the State Bar of Wisconsin. Perhaps it is possible to show that they have difficulty achieving their goals, or that the abilities or ethical standards of lawyers in the voluntary bar states are not as high as in states with mandatory bars, although Professor Schneyer's study suggests otherwise. Even if interests such as public education on legal issues and studies of proposed legislation that are asserted to justify the mandatory bar were compelling interests, defendants have not shown that the mandatory bar is the least restrictive means of achieving those interests.

### 7. Conclusion

I find that the payment of bar membership dues as a condition of practicing law in Wisconsin is a significant infringement on plaintiff's First Amendment right not to associate and his right not to speak. Furthermore, I find that defendants have not identified a governmental interest sufficiently compelling to outweigh the infringement on plaintiff's rights, or shown that the mandatory bar requirement is the least restrictive means of achieving the goals embodied in the Bar's various activities. Accordingly, I hold that under the First Amendment plaintiff may not be required to become a member of the State Bar.

Because I have found the mandatory membership requirement a constitutionally impermissible burden on plaintiff's rights of association and speech, I do not reach plaintiff's alternative argument concerning the constitutional adequacy of the Bar's procedures for reducing the dues of dissident members by the pro rata amount spent on legislative activities.

bar association would be dominated by the metropolitan areas of Dane and Milwaukee Counties, and that the Bar would not reflect the diversity of opinions and groups that it does now. However, Gimbel's opinions do not amount to a showing that, in fact, lawyers would evade their professional responsibilities

**ORDER**

IT IS ORDERED that defendants' motion for summary judgment is DENIED and that plaintiff's motion for summary judgment is GRANTED.

or that the Bar would be dominated by a few, unrepresentative groups. Moreover, it is difficult to see how lawyers could evade their professional responsibilities, given the supreme court's regulation of ethics and legal education. I have already addressed the problem of forced diversity.