IN MATTER OF DISCONTINUATION OF STATE BAR OF WISCONSIN AS AN INTEGRATED BAR.

Supreme Court

*No. 79–1801–OA. Heard September 13, 1979.—
Decided January 8, 1980.*
(Also reported in 286 N.W.2d 601.)

For the petitioners there was a brief by *John E. Armstrong, John F. Jenswold, Trayton L. Lathrop,* all of Madison; *David S. August,* Milwaukee; *Douglas W. Kramer,* Portage; with *Arthur DeBardeleben,* Park Falls, and *Steward G. Honeck,* Milwaukee, of counsel, and oral argument by *John E. Armstrong, John F. Jenswold* and *Trayton L. Lathrop,* Madison; *Thomas Swisher,* Columbus, Ohio; and *Arthur DeBardeleben,* Park Falls.

There was also oral presentation by the following: *Webster Hart* of Eau Claire; *Amedeo Greco, Steven Levine, Jack McManus, Joseph Owens, Douglas Nelson, Richard Calloway* and *David Weber,* all of Madison.

For the State Bar of Wisconsin there was a brief by *Glenn R. Coates,* Racine, and oral argument by *Glenn R. Coates* and *Lawrence J. Bugge* of Madison.

There was also a brief by *Robert F. Boden* of Milwaukee, joined by *Victor A. Miller,* St. Nazianz, *James D. Ghiardi* and *Charles W. Mentkowski,* both of Milwaukee; and oral presentation by *Robert F. Boden, James Baxter, Ted Johnson, Irvin Charne,* all of Milwaukee, on behalf of the Milwaukee Bar Association.

*PER CURIAM*   On May 8, 1979, a petition was filed by five attorneys asking that this court discontinue the State Bar of Wisconsin as an integrated bar. The petitioners state that they caused a poll to be taken of all active members of the State Bar, numbering 9,319 lawyers, on the question "Do you favor the continuation of the State Bar of Wisconsin as an integrated bar?" According to the petitioners, the response to that question was 1,892 affirmative and 2,820 negative. The petitioners allege that continuation of the integrated bar in Wisconsin "would be contrary to the interests of this court, the state of Wisconsin and the public at large."

The petition was noticed for a public hearing, and we also invited all interested persons to submit written comments on the question of continued integration of the State Bar. The public hearing was held on September 13, 1979, and presentations were made by petitioners, by representatives of the State Bar, the Wisconsin Academy of Trial Lawyers and the Milwaukee Bar Association and by several practicing attorneys. Written comments were received from more than 20 attorneys from around the state.

The petitioners argue that the reasons for which the Wisconsin bar was integrated, namely, to supervise admission to the bar, to promote continuing competency of lawyers and to enforce lawyer discipline, no longer exist now that these functions are being performed by boards which were created by the court and operate indepen-

dently of the State Bar. They further argue that lawyers should not be required as a condition of their right to practice law in Wisconsin to financially support State Bar activities of which they do not approve, especially legislative and political activities.

We have indicated activities which we deem appropriate for the State Bar. *Integration of Bar* cases, 249 Wis. 523, 25 N.W.2d 500 (1946); 273 Wis. 281, 77 N.W.2d 602 (1956); 5 Wis.2d 618, 93 N.W.2d 601 (1958); 81 Wis.2d xxxv (1977); *Lathrop v. Donohue*, 10 Wis.2d 230, 102 N.W.2d 404 (1960), affirmed 367 U.S. 820 (1961). They are also set forth in the State Bar Rules and Bylaws originally approved and promulgated by the court. 273 Wis. vii (1956).

At the public hearing on the petition we were advised that an organization closely associated with the State Bar has solicited, obtained and spent voluntarily contributed funds in support of partisan political candidates and groups. That organization is the Wisconsin Lawyers Political Action Committee (LAWPAC) and has as its stated purposes "to influence the nomination or election of qualified candidates to elective public office in the State of Wisconsin and to influence voting on referendum issues submitted to vote in the State of Wisconsin." While LAWPAC is organized as a voluntary, non-profit, unincorporated political association and is not supported by State Bar membership dues, its board of directors is elected by the Board of Governors of the State Bar, which also has the power to remove any member of the LAWPAC board for cause, and the LAWPAC office is located in the State Bar building.

We are concerned that the State Bar, through LAWPAC, may be engaging in activities which we have proscribed, but we do not find any or all of the allegations and arguments of the petitioners and others sufficient to warrant changing the status of the State Bar to a voluntary bar. However, pursuant to State Bar Rule 10, which we adopted on November 18, 1977, we will

appoint in January, 1982, a committee to review the performance of the State Bar in carrying out its public functions, and we will direct that committee to review, evaluate and report by June 1, 1982, on the activities of the State Bar, especially its legislative activities, in the light of our statements on the subject.

The petition to discontinue the State Bar of Wisconsin as an integrated bar is dismissed.

DAY, J. *(Dissenting).* I dissent. I would grant the petition to discontinue compulsory membership in the State Bar of Wisconsin. I feel that the best interests of this Court, the members of the legal profession and the people of this state would be better served if membership was voluntary. The association would then depend for support on the attractiveness of its programs to its members instead of depending on the assessment of compulsory dues.

Up until the time this Court decided to "integrate" the bar[1] and require payment of dues to a Court sponsored bar association, the Court's role vis-a-vis the "bar" was to each lawyer as an individual, not as a collective mass known as a "bar association." The Court's role was its time honored one of determining who would be admitted to practice before the courts and setting a code of conduct, the infraction of which could result in discipline including disbarment. "Admission to the bar" or permission to hold oneself out as a lawyer and represent clients in the courts of this state, was by examination or graduation from the University of Wisconsin or Marquette University law schools or admission on foreign license in accordance with rules laid down by this Court. The purpose was to assure the people of this state that those who held themselves out as lawyers were

---

[1] The bar was integrated on a "trial basis" by Supreme Court order in 1956 and continued in effect on a permanent basis by order of this Court entered December 22, 1958. *See, Lathrop v. Donohue,* 10 Wis.2d 230, 102 N.W.2d 404 (1960).

competent. Competence was assumed to continue once admitted to practice. Violation of the Code of Ethics was grounds to take away the privilege of practicing or the imposition of lesser sanctions. The purpose was to protect the public from those who fall short of that standard of conduct expected of those society entrusts with representation of clients, whether individual, corporate or public, in the civil and criminal courts of this state.

Changing needs and different insights have changed the form but not the role of this Court toward the individual lawyer. We now require the continuation of legal education and proof each year of having taken certain prescribed credits of continuing legal education to help insure continuing competence of those whom we have licensed to practice law. Codes of Ethics have changed and we have implemented the means of processing complaints of ethical violation by lawyers and sought the more expeditious handling of cases requiring discipline by this Court.

This is the time honored and essential ongoing relationship between this Court and the lawyers who are also called officers of this Court. The public rightly expects us to devote our best efforts to insure, as nearly as possible, that those who represent clients in the courts of this state are competent and ethical.

We have set up two Boards directly under us to try and assure these results. The first is the Board of Professional Responsibility to try and assure compliance with the Code of Ethics. The second is the Board of Professional Competence, which is our means of providing for the orderly admission to practice of those seeking admittance and supervising continuing legal education.

Both boards are part of the Court's administrative system to carry out our responsibility for admission to practice and discipline. These boards operate separately from the integrated bar except that we utilize the mail-

ing and billing machinery of the State Bar to collect our assessment from the lawyers to finance the work of these boards.

These functions do not require that in addition we try and supervise an association performing the myriad tasks and services that professional societies perform for their members and services they undertake for the benefit of the public at large or segments of the public.

It has been my observation in five and one-half years on this Court that we more frequently react[2] to bar association action rather than act to initiate specific programs and policies for the bar to carry out. I do not say this in criticism. This Court does not have the time nor the staff to supervise, manage, set up budgets and do the many day-to-day jobs that a professional society may or should undertake. But if we really are to "run" the association, then it seems to me the public has a right to expect us to actively govern the association;[3] to

[2] An example is the questioning by the majority of the relationship between the "voluntary" political arm of the Bar and the Board of Governors of the State Bar.

[3] This Court previously recognized this requirement when it said in *In re Integration of Bar*, 249 Wis. 523, 528, 529 (1946):

"It appears to be assumed . . . that the court will fully exhaust its function by setting up the organization and requiring dues to be paid and that from there on the court will leave the organized bar to operate in a completely democratic and voluntary manner, dealing with such problems as in the opinion of the bar are proper for them to consider and to solve, and expending its moneys for these democratically ascertained purposes.

"Nothing is further from the truth in our opinion. It appears to us that the same considerations that may call for the court to exercise power initially to integrate, require it to censor the budgets and activities of the bar after integration. . . . the price of integration would be much greater than this court or any lawyer ought to be willing to pay, unless the exigencies in respect to standards of admission and discipline are so great as to warrant adoption of some such expedient, either temporarily or upon a limited scale."

These functions of admission and discipline are now under this Court.

decide what services should be provided to members, to determine what the dues should be and how much of the budget should go for scholarships for disadvantaged law students, how much should go for making legal services available to those under represented, how much should go to seeking legislation to help make the legal system function more responsively to the needs and wishes of various groups. Do we have enough programs for lawyers who are house counsel to corporations and associations and do not engage in private practice? Do we do enough for the large number of attorneys working full time for government agencies or in law enforcement or as public defenders? In my opinion, all of these are very proper concerns. What to do about them, however, is a matter that can bring forth a wide range and variety of opinion.

These are proper concerns for the Bar Association but it is the lawyer members who should debate and decide these questions; not this Court.

An association will be successful if it serves its members. It is the market place that should determine membership and dues, not forced membership as a requirement to practice law.

At the hearing on this matter and in materials submitted to us we were advised of successful voluntary associations in neighboring states with memberships in excess of ninety percent of lawyers admitted to practice.

I find it very significant that a large majority of the lawyers in this state who answered the questionnaire submitted to them by the petitioners[4] were opposed to continue compulsory membership. This issue will continue to be an unnecessary source of irritation by large numbers of attorneys who favor a voluntary rather than a compulsory membership policy.

---

[4] 2,820 opposed to integration; 1,892 in favor of continued integration.

It is for these reasons that I would grant the prayer of the petitioners.

I am authorized to state that Justice William Callow joins in this dissent.