IN the MATTER OF the STATE BAR OF WISCONSIN;
MEMBERSHIP—SCR 10.01(1) & 10.03(4); MEMBERSHIP
DUES & DUES REDUCTION—SCR 10.03(5); ASSEMBLY OF
MEMBERS—SCR 10.07(2); REFERENDUM
PROCEDURE—SCR 10.08; AMENDMENT OF RULES—SCR
10.13(1).

Supreme Court

*Filed June 17, 1992.*

(Also reported in 485 N.W.2d 225.)

 PER CURIAM. On May 16, 1991 the State Bar of
Wisconsin petitioned for the reinstatement of the inte-
grated bar in Wisconsin by resumption of enforcement

21

of the court's rules, SCR 10.03(1) and 10.03(4), establishing membership in the State Bar of Wisconsin as a condition precedent to the right to practice law in Wisconsin and limiting the practice of law in the state to enrolled active members of the State Bar. The court unified or "integrated" the State Bar in 1956 and it has remained so until May 6, 1988, when the court suspended enforcement of its mandatory State Bar membership rules in response to the decision of the United States District Court for the Western District of Wisconsin in *Levine v. Heffernan, et al.,* 679 F. Supp. 1478 (W.D. Wis. 1988), holding that the court could not require the plaintiff in that action to be a member of the State Bar of Wisconsin as a condition of his practicing law in the state.

Thereafter, *Levine, supra,* was reversed by the United States Court of Appeals in *Levine v. Heffernan, et al.,* 864 F.2d 467 (7th Cir. 1988). The United States Supreme Court denied certiorari in *Levine* but on the same day granted certiorari in another action presenting the issue of the constitutionality of an integrated bar, *Keller v. State Bar of California.* This court made no change in the status of the State Bar of Wisconsin while *Keller* was pending. In *Keller* the United States Supreme Court again upheld the constitutionality of a mandatory state bar membership rule but placed limitations on a state bar association's use of dues lawyers are required to pay to the association. *Keller v. State Bar of California,* 496 U.S. 1, 110 S. Ct. 2228, 110 L. Ed. 2d 1 (1990).

Soon thereafter, the United States Supreme Court granted certiorari in an action concerning a state bar association's procedures for member objection to its use of compulsory dues, *Gibson v. Florida Bar.* Because that issue was relevant here, this court again took no action on the status of the State Bar of Wisconsin, with the

result that enforcement of the court's mandatory membership rules remained suspended. After hearing argument in *Gibson,* the United States Supreme Court dismissed the petition for certiorari as having been improvidently granted. *Gibson v. Florida Bar,* — U.S. —, 112 S. Ct. 633, 116 L. Ed. 432 (1991).

In the meantime, the State Bar of Wisconsin conducted a study of its status as a unified bar association and as a voluntary one. Following that study, the State Bar petitioned the court to reinstate the integrated bar in Wisconsin. As part of that petition, the State Bar also sought the amendment of the dues reduction rule, SCR 10.03(5)(b), to conform to the holding in *Keller, supra,* in respect to the constitutional limitations on the use of compulsory dues.

Following the public hearing it held on the State Bar's petition, the court on March 10, 1992 reinstated the integrated bar in Wisconsin, effective July 1, 1992. The court adopted the proposed amendment to the dues reduction rule by separate order on March 13, 1992.

The court is persuaded that a unified association composed of all persons licensed by this court to practice law in the state is best suited to meet the lawyers' professional obligations to the public and to the legal profession itself. Because all lawyers, as practitioners of that profession, share those obligations, an association in which membership were voluntary would not be in the same position to meet them.[1]

---

[1] The court has addressed the issue of the integration of the State Bar on numerous occasions: *Lathrop v. Donohue,* 10 Wis. 2d 230 (1960), *In re Regulation of the Bar of Wisconsin,* 81 Wis. 2d xxxv (1977), *Matter of Discontinuation of the Wisconsin State Bar,* 93 Wis. 2d 385 (1980), *Report of Committee to Review the State Bar,* 112 Wis. 2d xix (1983).

Members of the legal profession have a duty to promote the public interest, as well as the interests of their individual clients. A significant aspect of the public's interest is the efficient and effective administration of justice. It is necessary that lawyers join in a common effort to carry out this duty, for lawyers acting individually or in discrete groups might lack the commitment and resources to effectively address more than a portion of their professional responsibilities. Acting as one, however, the members of the legal profession constitute a powerful force to further the improvement of the legal system, its laws, its courts and its practitioners.

As each lawyer shares the profession's obligation to the public, each lawyer properly may be required to support the profession's functions and activities directed to the interest of the public, even if only financially by payment of membership dues to the association acting to fulfill those obligations. It is to be hoped, however, that membership in the integrated bar association will motivate lawyers to contribute their time and talent, as well as their money, to the association's activities in furtherance of the cause of justice.

The United States Supreme Court identified two state interests justifying a unified state bar association: regulating the legal profession and improving the quality of legal service available to the people of the state. *Keller, supra,* 496 U.S. 13–14. Each of these interests is indissolubly bound together with the public's interest in justice and the legal system's ability to make justice attainable. These interests of the state are best furthered by an association in which every lawyer licensed to practice by the state is required to join and, at a minimum, support financially.

The United States Supreme Court held in *Keller, supra,* that mandatory dues of the members of a unified

24

bar association may constitutionally be used to fund activities germane to the identified state interests in regulating the legal profession and improving the quality of legal services. Consistent with that holding, we have adopted the State Bar's proposed amendment to the dues reduction rule, SCR 10.03(5)(b). The procedure set forth therein for member withholding of payment for activities other than those directed to furthering the identified interests and for objection and arbitration of disputes concerning the State Bar's activities which may constitutionally be funded by mandatory dues provide adequate protection to the association's members who would limit their financial contribution to that which constitutionally can be exacted.

For the reasons set forth above and upon the specific petition of the State Bar of Wisconsin, on March 10, 1992, the court ordered the reinstatement of the integrated State Bar of Wisconsin, effective July 1, 1992.

HEFFERNAN, CHIEF JUSTICE *(concurring)*. I join the Per Curiam opinion in support of the reinstatement of the integrated bar. I also join the concurrence of JUSTICE BABLITCH insofar as it recites convincingly the merits of the integrated bar and recounts the accomplishments of the legal profession as the result of bar integration. My own legal career commenced eight years before court-directed integration. My personal observation and experience validates JUSTICE BABLITCH'S thesis that the delivery of legal services to the public and the standards of the profession were substantially improved as a direct consequence of integration. The bar became a more responsible profession as the result of the unified bar. The reinstatement of the mandatory bar will assure that it will continue to be a responsible organization for the delivery of legal services.

25

WILLIAM A. BABLITCH, J. *(concurring)*. All lawyers have a special responsibility to society. That responsibility involves far more than merely representing a client. Lawyers are the guardians of the rule of law. The rule of law forms the very matrix of our society. Without the rule of law, there is chaos. Lawyers not only have a responsibility to their clients, they have an equal responsibility to the courts in which the rule of law is practiced, and to society as a whole to see that justice is done. I cannot, and do not, share the view of my dissenting colleague that these responsibilities can be adequately fulfilled by allowing individual lawyers to choose whether they will participate in an organized professional bar. During the years that membership in the bar was mandatory, programs and services that were aimed at fulfilling the special responsibilities lawyers have to society grew and flourished. These programs produced little economic benefit to the lawyers, but great benefit to society. These programs and services, detailed below, will inevitably suffer if we go back to a voluntary bar. Revenues will be unpredictable; programs and services will more and more reflect efforts to recruit and maintain membership—inevitably at the cost of those programs and services for which there is no economic benefit to the bar and to its members. I therefore write to answer and respectfully express my disagreement with my dissenting colleague.

I am not unmindful of, nor unsympathetic with, the feeling of those who are repelled by the very thought of being forced to join any organization regardless of personal preference. I too shared that repugnance when I first entered the field of law some 27 years ago in 1965. My journey from repugnance to acceptance to advocacy has not been particularly constant nor smooth. But it has been shaped by people, experiences, and perspectives

26

gained. All have led to a growing personal awareness and an inner certainty of conviction that being a lawyer in today's society involves very special responsibilities to society that can best be served, perhaps only be served, by an integrated, mandatory bar association.

In 1965, when I first entered law school, was not that far in years and experience from those years when the bar was completely voluntary. It was not until 1956 that the bar became mandatory. In 1965, and in 1968 when I graduated from law school, many remnants of those voluntary days were still in evidence. Although there were then many highly motivated lawyers, professional in the very best sense of that word, from my perspective the bar as a whole seemed to be dominated by the "bottom liners," the ones for whom the only thing that mattered was the economic pay-off from the degree or the practice. At that time, the bar was largely male dominated, women and minorities were few and their prospects were not bright. They constituted less than half a dozen from my class of 200 plus students. If the bar at that time offered programs and services designed to fulfill our responsibilities to society as a whole, they were few in number and relatively unknown.

Fortunately, at that time, a medley of voices from within the bar began to be heard. They spoke of a growing social awareness, a growing social consciousness, that as members of a special profession, we have special responsibilities. They spoke of the need to enhance and improve our delivery of justice to the people, to bring the courts into the 20th century, to educate and enlighten the public about our system of justice. They spoke about the responsibilities of the bar to the poor in society, the responsibilities of those who call themselves lawyer to engage in continuing legal education, the responsibilities of all of us to police ourselves and discipline those among

us who stray from the high standards of expected practice.

Those voices were eventually heard. The judiciary was transformed from a hodgepodge of courts to a model for the country, the cost and time for justice on appeal was lessened, public defender programs at the state and local levels were established, free legal services such as legal aid came into existence, continuing legal education became mandatory, a system of discipline that heretofore had winked at even serious transgressions was transformed into a system of discipline with teeth. Women and minorities played an ever increasing role. Today, women and minorities account for 50 percent or better of those who stand before us to be sworn into practice.

None of these changes came easily. Placed into existence over a long period of time, many changes were hardly noticed. But when you look at where we were 25 years ago, and where we are now, the change has been fundamental and it has been enormous. Only an irrational person would claim the change has not been beneficial.

As I look back, I cannot see how much of this reform could have been accomplished without a mandatory bar. Certainly there were other variables present during those years, but the primary variable that could affect change that has been in place since 1956, and not before, was a mandatory bar. The mandatory bar gave a platform and an organization to those voices of responsibility within our profession that were not "bottom liners." Socially conscious men and women lawyers were able to take our profession from those premandatory days when the public was largely forgotten in the rush to economic nirvana, to a place today that, although not the epitome of professionalism, is far closer

to the ideal than 25 years ago. Without a mandatory association, and the resulting economic freedom of that association to push and propel these changes, I have no doubt the bar today would look much more like pre-1956 than post-1956. And some wish to return to those good old days of yesteryear? Those who fail to learn from the mistakes of history are bound to repeat them.

Those men and women who helped bring about change, and they know who they are though most of us don't, recognized that being a lawyer involves far more than an opportunity to make a comfortable living. They knew, and it is hoped most of us now know, that being a lawyer involves a special responsibility to society itself.

I fear, in fact I predict with certainty, that a return to a voluntary bar would be a return to those days of stagnation, to those days when the question of "what's in it for me?" drowned out the question of social responsibility. The lessons of the past are evident.

The mandatory bar has been an essential force in assisting lawyers to fulfill their roles as guardians of the rule of law. Of equal importance, the mandatory bar has been a guiding force in assisting lawyers to deliver an increasing quality of justice to society and to those they represent. Many if not most of the services the bar delivers in pursuit of these goals are not self-supporting and are not capable of being subject to user fees. To cite but a few, they include: publications to members keeping them up to date on legal developments including orders and decisions of this Court which regulate the profession and discipline attorneys; publications for public consumption informing the public on matters of justice and the rights and responsibilities of citizens under law; lawyer referral service, assisting members of the public to find qualified lawyers regarding specific legal issues; assistance and promotion of pro bono activities; fee arbitration service;

assistance in the disciplinary system by appointing approximately 200 lawyers and lay persons to district grievance committees; ethical advice and guidance to members; assistance to alcoholic, ill and disabled lawyers through the "lawyers helping lawyers" program.

If the bar is voluntary, market forces will eventually dictate that much of the bar's resources, economic and personnel, will have to be directed at recruiting and maintaining membership. The "what's in it for me" syndrome will drive programs, services, and personnel in the direction of self interest, not social responsibility.

If we go back to a voluntary bar, time and money spent on recruiting will mean less time and resources spent on programs. Guess what programs?

If we go back to a voluntary bar, time and money spent on maintaining membership will mean time and money not spent on other services. Guess what services will suffer?

The answers are obvious. Programs and services not targetted to the "bottom line" will inevitably suffer. They are not economically self supporting and by definition can never be self supporting. Uncontradicted testimony at the public hearing on the question of an integrated bar evidences that this is already happening with our few short years of "experimentation" with a voluntary bar. One officer testified with chagrin that with increasing frequency she had to commit significant time to the issue of membership and justify the bar's existence to its voluntary members by engaging in activities such as "obtaining discounts at Shopko and at hotels around the state so that lawyers can say the bar responds to 'my' needs." Katja Kunzke, Testimony at the Hearing Before the Wisconsin Supreme Court Concerning Reinstitution of Mandatory Membership to the Wisconsin State Bar Association (March 4, 1992) (tape of hearing

available at the Office of the Clerk of the Supreme Court).

All who call themselves lawyer have an obligation to maintain these programs and services that inure to the ultimate benefit of the public. These programs and services go directly to the heart of our social responsibilities. They cannot be maintained without adequate and predictable support levels. To say that only those who voluntarily choose to be a member of the bar must pay for them is simply wrong. All share in this responsibility, whether they choose to individually participate in the bar or not. It is a responsibility assumed when they chose to be a lawyer, and continues as long as they choose to call themselves lawyer. This mantle of social responsibility, to society at large and to the individuals within it, is not one that can be shucked at will.

The public's perception of lawyers is well known and well documented. We ought not hide from ourselves the fact that some of that perception is self imposed. But as a profession, enormous strides have been made in the past few decades, positive strides towards the recognition of our special professional responsibilities and the fulfillment of them. We are not there yet, but as we get closer to being true professionals in the very best sense of that word, I feel confident that society, who already knows that lawyers play an enormously important role in society today, will come to realize that we are striving to fulfill our responsibilities. And with that realization will come, it is hoped, a greater respect for the profession and those who practice it.

As a graduate of a law school, no person is forced to join any organization, nor to practice law. But if that person wishes to practice law as a member of the legal profession, then he or she must take on the responsibilities of the profession. Those responsibilities come with

the territory, and are far better fulfilled together than apart.

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins in this concurrence.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I dissent from the March 10, 1992 order reinstating the integrated bar[1] and granting the State Bar of Wisconsin's petition for the amendment of Supreme Court Rules (SCR) 10.03(5), 10.07(2), 10.08 and 10.13(1)[2] for three reasons.[3]

---

[1]The order appears at 166 Wis. 2d xxix (1992).

On March 22–23, 1991, the Board of Governors voted 26–14 to file a petition to reinstate the integrated bar in Wisconsin. According to the Brief in Support of the Board of Governors Petition to Reinstate the State Bar of Wisconsin Mandatory Membership Rule, after the Board of Governors' vote, a drafting committee was appointed to prepare the petition for an integrated bar, taking into account the *Keller* decision and to recommend other changes to SCR Chapter 10, including review of a pending petition of the State Bar with the court concerning the governing structure of the Bar. The Executive Committee of the State Bar approved the submission of the integrated bar petition to this court on April 24, 1991. The petition was filed on May 16, 1991.

[2]The amendments of the rules are in an order filed on March 13, 1992, and appear at 166 Wis. 2d xxi (1992). These rule changes were apparently not adopted by the Board of Governors in 1992. In August, 1987, the Board of Governors submitted a substantially similar proposal to the court for amending the rules relating to setting dues and the referendum procedure. The Court at that time received numerous communications from individual lawyers and one from the Racine County Bar Association objecting to one or more of these changes.

[3]I previously dissented from an order refusing to open the decision-making conference on the State Bar's petition to reintegrate the bar. 166 Wis. 2d xv (1992). I believe the court should

First, I would not reinstitute a unified bar. I would keep the State Bar of Wisconsin a voluntary organization.

The two activities which, according to the United States Supreme Court, a unified bar may support with mandatory dues (namely, regulating the legal profession and improving the quality of legal service), are performed primarily by the Wisconsin supreme court and funded by annual assessments of all lawyers licensed to practice in this state. The merits of the unified bar have been debated for over 75 years. In that time no one has demonstrated that a unified bar has a better record of service to its members or to the public than a voluntary bar. Professor Ted Schneyer studied the State Bar of Wisconsin and concluded that its performance did not justify the claims for a unified bar.[4] The disadvantages of a unified bar, such as the constitutional restrictions on expending mandatory dues and the unified bar's dependency on the court, outweigh any claimed advantages. I believe the values of the individual attorney's freedom of association and a bar association's freedom and independence from the court trump any claimed benefits of mandatory membership.

Second, even if I agreed to a unified bar, I dissent from the amendments of the rules the court adopted which concentrate power in the Board of Governors and reduce the ability of individual members to participate in establishing Bar policy.

---

discuss and decide rule-making and administrative matters in open, public sessions.

[4]Professor Schneyer spent the 1981–82 academic year as a visiting scholar at the American Bar Foundation researching the unified bar. His views are set forth in *The Incoherence of the Unified Bar Concept,* 1983 Am. Bar Found. Res. J. 1.

Third, even if I agreed to a unified bar, I dissent from the amendments of the rules the court adopted which provide that any pro rata dues reduction awarded by an arbitrator will be refunded only to those members who have requested arbitration.

## I.

As the rules and the majority opinion recognize, the United States Supreme Court has limited the activities a unified bar may support with mandatory dues to expenditures "necessarily or reasonably incurred for the purposes of regulating the legal profession or 'improving the quality of legal service available to the people of the State.' " *Keller v. State Bar of California,* 496 U.S. 1, 14 (1990) (quoting *Lathrop v. Donohue,* 367 U.S. 820, 843 (1961)).[5]

I would not reinstitute a unified bar because these two activities, regulating the legal profession and improving the quality of legal service, are performed primarily by the Wisconsin supreme court, not the State Bar of Wisconsin.[6] To support these activities, the court

---

[5]SCR 10.03(5)(b)1, 166 Wis. 2d at xxii; Majority opinion at 24–25.

SCR 10.03(5)(b)1 provides:

"The state bar may use compulsory dues only for activities reasonably intended for the purpose of regulating the legal profession or improving the quality of legal services offered by members of the state bar. Other activities must be supported by voluntary dues, user fees or other sources of revenue."

[6]The court-appointed Kelly committee listed eight substantive professional activities that all licensed lawyers may be required to support. In Wisconsin, entities other than the Bar have primary responsibility for these activities. Patricia Heim, *The Case for a Voluntary Bar,* 64 Wis. Lawyer 10, 60 (Feb. 1991).

As the former executive director of the State Bar wrote to the

annually sets assessments which all lawyers licensed to practice in this state are required to pay. In 1976, the court explicitly removed these responsibilities from the Bar and placed them under the court's supervision to assure the public that lawyer discipline, bar admission, and regulating competence through continuing legal education would be conducted for the benefit of the public, independent of elected bar officials.[7]

The court's annual mandatory assessment on the lawyers of the state, not the membership dues paid to the State Bar of Wisconsin, finances the Board of Attorneys Professional Responsibility (BAPR), the investigatory and prosecutorial arm of the court for regulating lawyers. The Bar itself plays no direct role in the grievance process.

The court's annual mandatory assessment on the lawyers of the state, not membership dues paid to the State Bar, finances the court's mandatory continuing legal education program for improving the quality of legal services available to the people of the state. The Board of Bar Examiners (BBE), an arm of the court,

court on February 14, 1992: "Our bar has never sought to control the members in their practice or activities. It does things for lawyers, not to them."

[7] *In re Regulation of the Bar of Wisconsin,* 74 Wis. 2d ix (1976); *In re Regulation of the Bar of Wisconsin,* 81 Wis. 2d xxxv, xliv (1976). See also *Matter of Discontinuation of the Wisconsin State Bar,* 93 Wis. 2d 385, 389–90, 286 N.W.2d 601 (1980) (Day and Callow, JJ., dissenting), and *Report of Committee to Review the State Bar,* 112 Wis. 2d xix, xxxvi, 334 N.W.2d 544 (1983) (Abrahamson, J., concurring).

See also Report of the Commission on Evaluation of Disciplinary Enforcement to the American Bar Association (May 1991) recommending that investigative, prosecutorial and adjudicative functions of lawyer discipline be independent of elected bar officials.

administers the bar examination and the mandatory continuing legal education program imposed by the court. The State Bar is one provider, among many, of continuing legal education programs, but the Bar's continuing legal education programs are not funded by members' dues; they must be self-supporting. *In re Regulation of the Bar,* 81 Wis. 2d xxxv, xli (1977).[8]

Thus all lawyers licensed to practice in Wisconsin pay the court-mandated annual assessments to support the court-created and court-supervised boards primarily responsible for regulating the legal profession and improving the quality of legal service available to the people of the state. There are no "free riders."[9] We need not mandate membership in the State Bar to eliminate a problem with free riders when no such problem exists.

The State Bar of Wisconsin engages in many worthwhile activities, some of which are germane to regulating

---

[8]The court's mandatory assessment on the lawyers of the state also supports the Client Security Fund to protect the public.

[9]The United States Supreme Court has defined "free riders" in the collective bargaining process as those who "refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees." *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 222 (1977).

Chief Justice Rehnquist, writing for a unanimous court in *Keller,* wrote about free riders in the bar association context as follows: "It is entirely appropriate that all of the lawyers who benefit from the unique status of being among those admitted to practice before the courts should be called upon to pay a fair share of the cost of the professional involvement in this effort." *Keller,* 496 U.S. at 12. Chief Justice Rehnquist concluded that "Here the compelled association and integrated bar is justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members." 496 U.S. at 13–14.

lawyers and improving the quality of legal services and some of which are not. For example, the State Bar keeps its members up-to-date on recent legal developments by publishing articles and distributing materials on legal issues, summaries of legislation and cases, and the texts of disciplinary matters; upon direction of the court it appoints lawyers and lay persons to district committees that work with BAPR; it distributes publications designed to inform the public about law and the administration of justice; it encourages lawyer participation in pro bono activities; it operates a telephone "hot line" providing legal advice; it proposes rules to this court about professional responsibility and legal education; it influences legislation; it issues ethical opinions to lawyers; and it provides assistance to alcoholic, ill and disabled lawyers in order to protect the public. Some Bar activities are supported by user fees; others are not. Voluntary bar associations across the country engage in similar activities to those of the State Bar of Wisconsin.[10]

The State Bar is not the only organization of lawyers that plays a valuable role in assisting the court in regulating the legal profession and improving the quality of legal services available to the people of Wisconsin. There are public interest law firms, legal service associations, and other organizations of lawyers, representing the diverse views of lawyers. Although the Bar asserts that a unified bar is much better equipped to speak for the profession with respect to important regulatory and

---

[10]Unified bars in other states differ from the State Bar of Wisconsin in their functions and in the degree of control by the judiciary. For a description of the California State Bar, see, e.g., Anthony Murray, *The Unified Bar Serves the Public Interest,* California Lawyer, May 1983, at 13.

other issues and to make appropriate recommendations to this court, the Bar does not explain why.

Numerous lawyers and scholars across the country have compared the virtues of unified and voluntary bars. Although many claims are made for a unified bar, no one has demonstrated that a unified bar has a better record for service to its members or to the public than a voluntary bar. Neither the Bar's petition nor the court's per curiam opinion gives any reason for concluding that the Bar's operation has been hindered by its voluntary status for the past four years or that the Bar's operation would be significantly improved by a mandatory membership requirement.

The State Bar of Wisconsin has operated well during the four fiscal years since the court made membership voluntary in May 1988. Over 80 percent of lawyers licensed to practice in Wisconsin voluntarily joined the Bar during this period; out-of-state practitioners constitute the largest block of lawyers who did not join. When out-of-state lawyers are omitted from the statistics, the percentage of Wisconsin practitioners who voluntarily joined the Bar rises to 90 percent. This large percentage of Wisconsin attorneys who have voluntarily joined the Bar is a forceful argument for leaving the voluntary status undisturbed.[11]

The Bar's voluntary status has resulted, I believe, in the Bar's greater responsiveness to the needs and wishes

---

[11]The high rate of participation in the voluntary bar should be compared to the high percentage of lawyers who objected to the continuation of the unified bar. In 1979 after the Bar refused to hold a petitioned-for referendum relating to unification, several bar members financed an independent vote of the membership on the unification question. Sixty percent of those voting favored a voluntary bar. *Matter of Discontinuation of Wisconsin State Bar,* 93 Wis. 2d 385, 386, 286 N.W.2d 601 (1980).

of the members in efforts to attract members and keep them enrolled. It also appears that the Bar has worked harder during its voluntary period to include women, minorities and government lawyers in committees and activities in an effort to encourage participation and membership among these sometimes alienated groups.[12]

The Bar's brief asserts that a mandatory bar is less likely to come under the control of discrete elements of the profession and that "it is particularly important that young lawyers, government lawyers, women and minority lawyers and lawyers who practice in rural areas have a strong voice in an integrated bar." Bar's Brief in Support of Petition, at 16. The Bar does not explain how its new structure as a unified bar will accomplish these goals. More about this later.

I wrote in 1983 that I was not persuaded that a unified bar is inherently better than a voluntary bar in

---

[12]In connection with the Bar's petition to reinstate the unified bar, Attorney Erica M. Eisinger, Chair, Special Committee on the Participation of Women in the Bar, wrote Daniel W. Hildebrand, President of the State Bar of Wisconsin, on Feb. 11, 1992, as follows: "It is often contended that a unified bar will facilitate greater participation of women and minorities than a voluntary bar. The Special Committee on Participation in the Bar believes it would be helpful to the Court, the Bar, and the public to consider information on the participation of women and minorities in the Bar during a comparable period of time under each system." Mr. Hildebrand and Steve Smay, Executive Director of the Bar, furnished information to the court on the participation of women in the bar. See letters of Feb. 13 (Abrahamson, J.), 19 (Hildebrand), 26 (Smay), 27 (Abrahamson, J.), March 3 (Smay), March 6 (Smay), 9 (Hildebrand), 1992, all on file in *In the Matter of Supreme Court Rules of Chapter 10: Regulation of the State Bar,* Office of the Clerk of the Supreme Court, Madison, Wis.

performing the services the State Bar ascribes to itself.[13] I am now persuaded that the disadvantages of a unified bar outweigh any claimed advantages.

Our legal system and our fundamental liberties rest to a large extent on an independent bar and an independent judiciary. The bench and bar should, I believe, strive for amicable relations, but the public interest requires that each be independent of the other. It is important for bar organizations to be free to take positions not favored by the bench, and for the bench to regulate the practice of law in the public interest (which may not necessarily be in the interest of individual lawyers or a bar organization). The unified State Bar of Wisconsin, controlled as it is by this court,[14] cannot be independent, as many lawyers have openly acknowledged.[15] That's not good.

---

[13] *Report of the Committee to Review the State Bar,* 112 Wis. 2d at xxxiii (Abrahamson, J., concurring).

[14] This court has the power to exercise control over the Bar and has used this power. Among other things, the court has ordered the State Bar to stop using a dues checkoff procedure to raise contributions for the Wisconsin Bar Foundation; voided a bar assessment to raise funds for an institutional advertising campaign; altered the Bar's governance structure giving the Assembly of Members additional powers; placed nonlawyers on the Board of Governors; and forbade the Bar to involve itself in the activities of a lawyers' political action committee.

[15] Wisconsin attorney Steven Levine wrote that a comment he heard all too frequently in his years on the Wisconsin State Bar Board of Governors was " 'How will it play to the supreme court?' Whenever a controversial proposal was debated at a bar meeting, the supreme court's reaction was a prime consideration in whether the board went ahead with the action. A voluntary bar would be an independent bar—independent to follow its own will." Steven Levine, *Time to Move to a Voluntary Bar,* 1990 Wis. L. Rev. 213, 217.

A unified bar is handicapped in speaking out about legislative and public policy issues because of the limitations placed on it by the constitution and the *Keller* decision.[16]

The dividing line between expenditures chargeable and not chargeable to mandatory dues is still unclear. For instance what does "improving the 'quality of legal services' " mean? As the United States Supreme Court wrote, "precisely where the line falls . . . will not always be easy to discern." *Keller,* 496 U.S. at 15. The Court concluded that only "the extreme ends of the spectrum are clear." *Keller,* 496 U.S. at 15. Professor David Luban concludes that the *Keller* opinion "leaves unanswered the question of how much of the bar's narrow law reform mission the Court has pared away. Even though the Court may believe it is finally through with the issue, the issue is probably not through with the Court." David Luban, *The Disengagement of the Legal Profession: Keller v. State Bar of California,* 1990 Sup. Ct. Rev. 163, 185. Mandatory dues spent on legislative or other activities will raise legitimate questions about the proper clas-

The president of the voluntary New York State Bar Association wrote: "A further factor in the life of the unified bar is the existence of control and authority exercised by the highest court over the affairs of the association. One benefit, of course, is the state-action protection available in anti-trust actions. This, however, may be more than offset by the loss of unrestricted self-determination and the ever-present risk of disagreement with the supervising judiciary which must produce sobering, if not chilling, effects in the contemplation of action known to be out of favor or likely to cause conflicts." Alexander D. Forger, *The President's Message,* N.Y. St. B.J., June 1981, at 263.

[16]For a discussion of the State Bar of Wisconsin's limited role in lobbying about medical malpractice reform, see Ted Schneyer, *Sunset for the Unified Bar?,* Sept./Oct. 1986 Bar Leader 20, 31.

sification of the activities. Discord and disagreement among members of the State Bar about which activities may be supported by mandatory dues will be a continuing issue.[17]

I agree with Professor Luban that the *Keller* decision may very well cause a unified bar to refrain from engaging in law reform. This will eliminate the bar association as an important forum for lawyers to discuss these matters and as a key entity working for the public interest. David Luban, *The Disengagement of the Legal Profession: Keller v. State Bar of California,* 1990 Sup. Ct. Rev. 163, 202.

A debate has raged across the country this past 75 years about the merits of a unified bar.[18] Opinions have

[17]See *Matter of Discontinuation of the Wisconsin State Bar,* 93 Wis. 2d at 391 (Day and Callow, JJ., dissenting); *Matter of Amendment of State Bar Rules,* 127 Wis. 2d at xiii (Abrahamson, J., dissenting); Patricia Heim, *The Case for the Voluntary Bar,* 64 Wis. Lawyer 10, 11 (Feb. 1991); News, *What are the Big Savings?,* A.B.A.J., March 1991, at 36.

[18]Herbert Harley the founder of the American Judicature Society is generally credited with beginning the unification movement with a speech to the Lancaster County Bar Association in Lincoln, Nebraska on December 28, 1914. Stephen E. Kalish, *The Nebraska Supreme Court, the Practice of Law and the Regulation of Attorneys,* 59 Neb. L. Rev. 555, 556 (1980).

For discussions of unified and voluntary bars, *see, e.g.,* James K. Robinson, *Meeting Keller's Challenge to the Future of Michigan's Integrated Bar,* June 1991 Mich. B.J. 516; Patricia Heim, *The Case for a Voluntary Bar,* 64 Wis. Lawyer 10 (Feb. 1991); Irvin Charne, *The Case for a Mandatory Bar,* 64 Wis. Lawyer 10 (Feb. 1991); Steven Levine, *Time to Move to a Voluntary Bar,* 1990 Wis. L. Rev. 213, 217; Robert W. Webster, *The Keller Decision,* July 1990 Mich. B.J. 628; *The Sun Still Shines,* Sept./Oct. 1986 Bar Leader 19; Ted Schneyer, *Sunset for the Unified Bar?,* Sept./Oct. 1986 Bar Leader 20; Charles W. Sorenson, Jr., *The*

been and remain divided. For 75 years no one has resolved the issue of what activities are appropriate for a unified bar association, or whether a unified bar is better than a voluntary one. The arguments in favor of a unified bar are based on the public interest, lawyers' self interest, and the interests of the bar association. Professor Ted Schneyer studied the State Bar of Wisconsin and concluded that its performance did not justify the claims for a unified bar. Professor Schneyer summed it up perfectly when he wrote: "The unified bar's problem lies in its inherently confused legal and political status which has trapped the institution in a crossfire of values. Sixty years after the beginning of unified bars, lawyers, judges and legislators still cannot figure out how the institution fits into our political scheme. They are unsure whether, or when, to regard a unified bar as a private voluntary association, a public agency or a compulsory membership organization. They are therefore unable to decide with any consistency which of the three corresponding policies should predominate in unified bar affairs—association autonomy, public accountability or

---

*Integrated Bar and the Freedom of Nonassociation—Continuing Seige,* 63 Neb. L. Rev. 33 (1983); Ted Schneyer, *The Incoherence of the Unified Bar Concept: Generalizing from the Wisconsin Case,* 1983 Am. B. Found. Res. J. 1; Edward D. Lascher, *Dismantle the Unified Bar,* May 1983 California Lawyer 12; Alexander D. Forger, *The President's Message,* June 1981 N.Y. St. B.J. 263; Special Project, *Compelled Financial Support of a Bar Association and the Attorney's First Amendment Rights: A Theoretical Analysis,* 66 Neb. L. Rev. 762 (1987); Note, *Renovating the Bar after Keller v. State Bar of California: A Proposal for Strict Limits on Compulsory Fee Expenditure,* 25 U. San. Fran. L. Rev. 681 (1991); Note, *Beginnings: Integration Comes to Texas,* Feb. 1989 Tex. B.J. 196.

the protection of captive members."[19]

The United States Supreme Court has held that a unified bar with limited functions funded by mandatory dues does not violate constitutional rights. Nevertheless when there is serious doubt across the state and across the country about the merits of a unified bar, and when there is no demonstrated need for a unified bar in Wisconsin, I believe the values of attorneys' freedom of association and a bar association's freedom and independence from the court trump any claimed benefits of mandatory membership. I believe Wisconsin should have the best of both worlds—a voluntary, independent, statewide general-purpose bar association and court-mandated annual assessments on lawyers to finance the court-supervised boards that carry out essential programs for regulating lawyers and improving the quality of legal services.

## II.

I also dissent from the amendments of the rules the court adopted which concentrate power in the Board of Governors and reduce the ability of individual members to participate in establishing Bar policy. See SCR 10.03, 10.07, 10.08, 10.13. By approving these amendments the majority has dismantled the open forums for the robust exchange of ideas.

The former rules required that an assembly of the members of the Bar be held at each annual and midwinter meeting or upon petition of 200 active members. A policy matter suggested by at least 10 members had to be placed on the agenda of the meeting. Notice of the time, place and agenda of the assembly was given to each

[19]Ted Schneyer, *Sunset for the Unified Bar?*, Sept./Oct. 1986 Bar Leader 20, 22.

member by mail or publication in the Bar Bulletin. A quorum of at least 300 members present in person was required. The assembly could take binding action on any matter on the agenda. In addition, at each annual meeting, at a time and place stated in the printed program, the members had an opportunity to confer with the officers and executive committee and present any complaints or suggestions for the improvement of the State Bar. SCR 10.07 (1992).

Under the amended rules, effective July 1, 1992, the two annual required assemblies of members will no longer take place. Under the new rules, an assembly of members *may,* but need not, be held at each annual and midwinter meeting; the purpose of the assembly is limited to "discussing any issue of association public policy." SCR 10.07(2), 166 Wis. 2d at xxiii.

Under the former rules, SCR 10.03(5)(a) provided that any change in the Bar dues must be made by a vote of the membership at an annual or midwinter assembly or in a referendum. Review by the supreme court was available on petition of 25 Bar members. Under the amended rules, effective July 1, 1992, changes in the dues may be made by the Board of Governors alone. 166 Wis. 2d xxii–xxiii.

Under the former rules, SCR 10.13(1) provided that proposals for amendment of chapter 10 regulating the Bar could be presented to the supreme court by the Board of Governors or by petition approved by a vote of a majority of members present at two consecutive meetings of the Bar. The new SCR 10.13(1) provides that proposals for amendment of chapter 10 may be presented only by the Board of Governors or through the referendum procedure. 166 Wis. 2d xxvi.

The amended rules, effective July 1, 1992, further limit the rights of individual members or a minority

group by making the referendum procedure more difficult. Under the old rule, 300 signatures were needed on a petition to submit a referendum to the members. Under the newly adopted rules, 1,000 signatures are needed on such a petition, including at least 50 signatures from *each* of the State Bar's six districts. As if these restrictions were not sufficient to dissuade dissidents, the court adopted an additional requirement at the State Bar's request: the signatures must be obtained within the 90 days before the petition is filed.

Should a dissident group succeed in meeting these petition requirements, the 1,000 petitioners are still not assured that their issue will be brought before the membership for a vote. The amended rules give the executive director of the State Bar the power to determine whether the petition question is "properly the subject of a referendum." SCR 10.08(6). Any disputes concerning the executive director's decision are resolved by the Board of Governors. 166 Wis. 2d xxiii–xxvi.

Referendums will be conducted only once a year, simultaneous with the election of officers of the State Bar, namely in May. The petition of 1,000 members for a referendum has to be filed at the State Bar headquarters on the first business day in January to be on the May ballot. A referendum initiated by the Board of Governors need not, however, be authorized until February 28 to be on the ballot in May.

The Bar's brief in support of its petition for reinstatement of the unified bar stresses that a unified bar will be stronger than a voluntary bar because of the diversity of members and of opinion. The brief states: "Dissenting opinions on issues affecting the regulation of the legal profession are important in the formulation of policy. Encouragement of dissent in the integrated bar has prevented the Bar from becoming a sterile organiza-

tion in place of the innovative organization that most lawyers are proud to join." State Bar's Brief at 17.[20] After the court ordered integration of the Bar, the State Bar sent a letter to each of its members stressing the value of diversity of opinion and dissent and pledging to be responsive to the members' needs and concerns. I applaud these efforts. I cannot help but note, however, that the Bar's proposed amendments (which the court adopted verbatim) have eliminated forums in which members could express their views, including their disagreements with the Board of Governors, and have made it much more difficult for members to challenge the Board's and officers' decisions.

### III.

To meet constitutional requirements and to address the use of compulsory dues for activities other than those allowed by the *Keller* decision, the State Bar proposed that an arbitration procedure be combined with dues reduction. The court adopted the Bar's proposal which distinguishes among groups of lawyers for purposes of refunding any dues reduction an arbitrator may award. Only those who request arbitration and those who are admitted to the State Bar after the date of the arbitrator's decision are eligible to receive refunds as a result of the arbitrator's award. SCR 10.03(5)(b)5. A member who withholds a pro rata portion of dues budgeted for activities that cannot be supported by compulsory dues but who does not demand arbitration does not get the benefit of the arbitration decision. In effect this

---

[20]The State Bar's brief explains that the integrated bar was not foisted upon unwilling members by current leadership but was subject to open debate, published views and informed member participation before a decision was made.

47

rule permits the State Bar to spend compulsory dues on purposes an arbitrator determines to be improper. This result is troublesome.

I see no reason for requiring each member who chooses dues reduction to request and participate in arbitration, which may be a time consuming and costly effort. In 1987, the court asked the Bar to propose a dues reduction procedure whereby all members who had elected dues reduction would share in any additional reduction resulting from arbitration. The court at that time believed this approach to be "reasonable." *In re Petition to Review Bar Amendments,* 139 Wis. 2d 686, 693, 694, 407 N.W.2d 923 (1987). I still do. I would have adopted a rule providing that the arbitration awards be refunded to *all* attorneys who chose to pay only the mandatory portion of bar dues.

****

Although I would have preferred a voluntary bar association, I join the majority opinion in urging all lawyers to participate in the work of the State Bar. This will ensure that the Bar works in the public interest and truly represents the diversity of its members.